CHICAGO JUNCTION RAILWAY COMPANY v. DULUTH LOG COMPANY.[1]

January 23, 1925.

No. 24,249.

**Under Transportation Act, 1920, consignor's liability not secondary to that of consignee.**

1. Transportation Act, 1920, prohibiting the delivery of freight at the point of destination without the payment of tariff charges, except under such rules and regulations as the Interstate Commerce Commission may prescribe, does not of itself operate to release the consignor from liability when the carrier delivers freight to the consignee without payment, or make the consignor's liability secondary to that of the consignee.

**Liability for tariff charges is question of contract—shipment with milling in transit privilege.**

2. The general rule is that the consignor, who makes the contract with the carrier, is primarily liable for tariff charges. The question is one of contract to be determined from the facts of the case. An interstate shipment was made, with a milling in transit privilege, the consignor making the contract with the carrier, retaining control, and changing the consignee in the course of the transportation. Delivery, as permitted by the rule of the commission, was made by the carrier to the consignee without payment of freight. The bill of lading provided that the consignee should pay charges. A finding that the consignor remained liable is sustained.

Action in the district court for St. Louis county to recover $198.91. The case was tried upon stipulation of facts before Fesler, J., who ordered judgment in favor of plaintiff for $183.02. From the judgment, defendant appea ed. Affirmed.

*Chauncey C. Colton*, for appellant.

*A. O. Bjorklund*, for respondent.

[1]Reported in 202 N. W. 24.

DIBELL, J.

Action to recover for the interstate transportation of freight. The facts were stipulated. There was judgment for the plaintiff and the defendant appeals.

On October 4, 1920, the defendant, Duluth Log Company, delivered to the Minneapolis, St. Paul & Sault Ste. Marie Railway Company, commonly called the Soo Line, at Federal Dam, Minnesota, a carload of lumber to be transported to Duluth, there milled in transit, and then transported to Chicago. The lumber was milled at Duluth and on October 20 a car containing the product was delivered to the Soo Line for further transportation to Chicago. The lumber was consigned from Federal Dam by the defendant to itself at Duluth. It was consigned by the defendant at Duluth to the National Box Company at Chicago. At some time in the course of transportation the defendant reconsigned it to H. R. Gibbons Box Company, at Chicago. In the shipment from Federal Dam to Duluth and the shipment from Duluth to Chicago the bill of lading was that adopted by the Interstate Commerce Commission by order No. 787, on June 27, 1908. 14 I. C. C. 346, 351. The eighth section provided:

"The owner or consignee shall pay the freight and all other lawful charges accruing on said property, and, if required, shall pay the same before delivery."

The plaintiff, Chicago Junction Railway Company, received the car from the Soo Line in Chicago, paid the Soo charges, and delivered it to the consignee, H. R. Gibbons Box Company. That company was not on its credit list, but upon investigation it found that it was rated by Dun and Bradstreet as financially responsible. In order to avoid additional car service accruing it released the shipment without requiring the prepayment of freight charges by the box company. Thereafter bills were sent and payment demanded and refused. The freight has not been paid and the consignee has not been sued.

1. The defendant claims that under Transportation Act, 1920, Act of February 28, 1920, c. 91, § 405, 41 St. 456, 479, amending

the Interstate Commerce Act of February 4, 1887, c. 104, § 3, 24 St. 379, 380, it is not liable for the freight. The amendment, so far as important, is as follows:

"From and after July 1, 1920, no carrier by railroad subject to the provisions of this act shall deliver or relinquish possession at destination of any freight transported by it until all tariff rates and charges thereon have been paid, except under such rules and regulations as the Commission may from time to time prescribe to assure prompt payment of all such rates and charges and to prevent unjust discrimination."

On June 4, 1920, the Interstate Commerce Commission, pursuant to the amendment, prescribed this regulation:

"Where retention of possession of any freight by the carrier until the tariff rates and charges thereon have been paid will retard prompt delivery or will retard prompt release of equipment or station facilities, the carrier, upon taking precautions deemed by it to be sufficient to insure payment of the tariff charges within the period of credit herein specified, may relinquish possession of the freight in advance of payment of the tariff charges thereon and may extend credit in the amount of such charges to those who undertake to pay such charges, such persons being herein called shippers, for a period of ninety-six hours to be computed as follows:" 57 I. C. C. 596A.

When the railroads were under government control the Director General prescribed General Order No. 25, providing that "the collection of transportation charges, by carriers under federal control, for services rendered, shall be on a cash basis," and that "credit accommodations * * * shall be cancelled." It was further provided that where the enforcement of the rule "will retard prompt forwarding or delivery of the freight or the prompt release of equipment or station facilities, carriers will be permitted to extend credit for a period of not exceeding forty-eight hours * * *" See 57 I. C. C. 591, 593; 92 I. C. C. 299.

The amendment of 1920 was directed against discrimination, as was section 3 of the Commerce Act which it amended, and pro-

vided in particular against the extension of credit, which itself afforded an opportunity for discrimination, and, besides, necessarily resulted in depriving the carriers of the use of money outstanding as credits which should be working capital instead. The language of the rule of the commission is much that of General Order No. 25 of the Director General. In considering rules and regulations to be adopted under the Transportation Act the commission said:

"The carriers have estimated that the enforcement of General Order No. 25 provides them with working capital of approximately $75,000,000 which, if the customs and practices in the extension of credit to shippers in vogue prior to the enforcement of that order were restored, would generally be outstanding as unpaid transportation charges." 57 I. C. C. 591, 594.

The amendment was not intended by Congress to put the liability for freight charges solely upon the consignee nor to relieve the consignor from primary liability. The statute had in view something quite different. It wanted to prevent discrimination. This was the purpose of the act amended. It wanted also to prevent the capital of the carriers from standing in the form of unpaid charges for transportation and therefore not working capital. Whether the shipper or consignee should pay the freight did not interest it. The Transportation Act did not relieve the consignor from liability for tariff charges.

2. The general holding is that the consignor is primarily liable for the payment of freight. The contract of the carrier is with him. The question arises in all sorts of situations and under different bills of lading. The question is one of contract. The cases are collected in 10 C. J. 445, and 4 R. C. L. 857. The defendant claims that by not collecting the tariff charges, and releasing the freight to the consignee, the plaintiff lost its claim against it or, if it still had a claim, that it is secondary to the liability of the consignee.

The general question was recently considered authoritatively in Louisville & N. R. Co. v. Central Iron & Coal Co. 265 U. S. 59, 44 Sup. Ct. 441, 68 L. ed. 900. The defendant sold coke to be delivered f. o. b. at its plant. Before delivery its purchaser sold and

upon its agreement to pay the freight the defendant delivered the coke at its plant to the plaintiff carrier and directed shipment to the place of business of its purchaser. It took bills of lading which it delivered to its purchaser and which recited that the coke was consigned to such purchaser. The bill of lading provided that "the owner or consignee shall pay the freight * * * and, if required, shall pay the same before delivery." There was an undercharge not discovered until June, 1920, three years after the shipment. The action was against the consignor to recover the difference between the undercharge and the published tariff. The lower court found that the carrier did not assume primary liability to pay the freight. Speaking to these facts and of this result the court said (at page 65):

"But delivery of goods to a carrier for shipment does not, under the Interstate Commerce Act (Comp. St. § 8563, et seq.) impose upon a shipper an absolute obligation to pay the freight charges. The tariff did not provide when or by whom the payment should be made. As to these matters carrier and shipper were left free to contract, subject to the rule which prohibits discrimination."

And again (at page 67):

"To ascertain what contract was entered into we look primarily to the bills of lading, bearing in mind that the instrument serves both as a receipt and as a contract. Ordinarily, the person from whom the goods are received for shipment assumes the obligation to pay the freight charges; and his obligation is ordinarily a primary one. This is true even where the bill of lading contains, as here, a provision imposing liability upon the consignee. For the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf; and a promise by him to pay therefor is inferred (that is, implied in fact), as a promise to pay for goods is implied, when one orders them from a dealer. But this inference may be rebutted, as in the case of other contracts. It may be shown, by the bill of lading or otherwise, that the shipper of the goods was not acting on his own behalf; that this fact was known by the carrier; that the parties intended not only that the

consignee should assume an obligation to pay the freight charges, but that the shipper should not assume any liability whatsoever therefor; or that he should assume only a secondary liability."

The facts are stated in detail in the opinion and there is a citation of the pertinent cases. The trial court's finding in favor of the defendant was sustained. So far as there is a question of fact involved in the case at bar it is resolved in favor of the plaintiff by the finding of the court. Our view is that the finding that the defendant was liable for freight charges, and that its liability was not secondary so that the plaintiff must first make an effort to collect from the consignee, is sustained. The plaintiff's release of the freight without the payment of freight was permitted under the rules of the commission as we construe the stipulated facts and the findings.

It will be noted that under the uniform bill of lading, to which we have referred, the consignor is given an opportunity to relieve himself from liability for freight by so indicating on the face of the bill. 52 I. C. C. 671; 64 I. C. C. 357, Appendix A. It may be that this is the only way in which the consignor under such a bill of lading can escape liability. Western Md. Ry. Co. v. Cross, 96 W. Va. 666, 123 S. E. 572. We are not interested in that question now.

Judgment affirmed.