# SOUTHERN PACIFIC TRANSPORTATION CO. *v.* COMMERCIAL METALS CO.

No. 81–622.   Argued March 31, 1982—Decided April 27, 1982

BLACKMUN, J., delivered the opinion for a unanimous Court.

*James H. Pipkin, Jr.*, argued the cause for petitioner. With him on the briefs were *Charles G. Cole, Michael R. Johnson*, and *Harold S. Lentz*.

*David M. Sudbury* argued the cause for respondent. With him on the brief were *Richard Gary Thomas* and *Robert L. Feldman*.*

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the question whether a common carrier's violation of credit regulations issued by the Interstate Commerce Commission (ICC) bars the carrier's collection of a lawful freight charge from a shipper-consignor who, under the terms of the shipment's bill of lading, is primarily liable for the charge.

## I

Petitioner Southern Pacific Transportation Company (SP) is a common carrier by rail. Respondent Commercial Metals Company (Metals), a Delaware corporation with principal

---

*Briefs of *amici curiae* urging reversal were filed by *Nelson J. Cooney, Robert A. Hirsch, Alan J. Thiemann*, and *Kenneth E. Siegel* for the American Trucking Associations, Inc.; and by *Patricia A. Smith* for the Association of American Railroads.

*Frederic L. Wood* filed a brief for the National Industrial Traffic League as *amicus curiae* urging affirmance.

place of business in Dallas, Tex., is in the business of buying and selling steel goods. Petitioner instituted this action against respondent in the United States District Court for the Northern District of Texas to recover freight charges for three cars of steel cobble shipped by rail in 1974 from Detroit, Mich., to Alhambra, Cal.

Each of the three shipments was consigned by Metals to Penn Central Transportation Company, as initial carrier,[1] under the uniform straight bill of lading prescribed by the ICC. Each bill of lading included a "nonrecourse" clause that the consignor might sign. That clause reads: "Subject to Section 7 of Conditions, if the shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement: The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges."[2] In each instance, respondent Metals, as consignor, failed to execute this nonrecourse clause. Metals, however, already had received payment for the goods prior to shipment. Tr. of Oral Arg. 5, 6, 24–25; Brief for Respondent 21.

---

[1] The shipments moved over the respective lines of the Penn Central, the St. Louis Southwestern Railway Company (an SP subsidiary), and the SP. Pursuant to an interline agreement, SP has paid the other two carriers their proportionate shares of the freight charges earned on the shipments.

[2] Section 7 of the Conditions of the Bill of Lading reads in pertinent part:

"The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property; but, except in those instances where it may lawfully be authorized to do so, no carrier by railroad shall deliver or relinquish possession at destination of the property covered by this bill of lading until all tariff rates and charges thereon have been paid. *The consignor shall be liable for the freight and all other lawful charges, except that* if the consignor stipulates, by signature, in the space provided for that purpose on the face of this bill of lading that the carrier shall not make delivery without requiring payment of such charges and the carrier, contrary to such stipulation, shall make delivery without requiring such payment, the consignor (except as hereinafter provided) shall not be liable for such charges. . . . The term 'delivering carrier' means the line-haul carrier making ultimate delivery." (Emphasis added.)

The first of the three cars was tendered to Penn Central at Detroit on April 11, 1974, for transportation to Carco Steel Corporation (Carco), as consignee, in Alhambra. SP released the car to Carco on April 25 without collecting the freight charge in advance of delivery. On the same day, however, SP mailed to Carco a bill for $4,634.11, the correct amount of the charge. Carco was not a credit patron of SP and had never applied to SP for credit. SP never before had made a delivery to Carco. Nevertheless, the carrier made no investigation of Carco's credit standing.

The second and third shipments took place on May 2, 1974, when Metals consigned two other cars of cobble to Penn Central for transportation to Carco. SP delivered the cars to Carco on May 16. This time, SP released the cars only after receiving checks from Carco in the respective amounts of $5,761.79 and $2,383.67 for the freight charges. The larger amount was correct, but the smaller check should have been for $3,283.66 and thus was $900 short.[3] On May 20, SP issued freight bills in the correct amounts to Carco. The two checks were dishonored by Carco's bank for insufficient funds.

In August 1974, after efforts to collect the unpaid freight charges from Carco had proved fruitless, SP filed suit against Carco in a California state court. Attempts to serve the summons and complaint were unsuccessful.

On December 17, 1976, more than 30 months after the shipments, SP notified Metals of Carco's failure to pay the freight charges. SP requested that Metals, as the consignor who had failed to execute the nonrecourse provision in the bills of lading, pay the $13,679.56 total charges in satisfaction of its primary liability for the three shipments. This was the first notice to Metals that the freight charges had not been col-

---

[3] SP suggests that the $900 difference was occasioned by a transposition of the initial digits. Brief for Petitioner 31, n. 21. No explanation of the one-cent variance is offered.

lected from Carco. When payment was not forthcoming, SP instituted the present action against Metals in federal court.

On this record, stipulated by the parties, the District Court ruled that SP had established a prima facie case for the recovery of the freight charges from Metals. It found the charges correct and in accord with applicable tariffs and that no part of those charges had been paid. App. 22. "Absent a showing of valid and affirmative defenses," then, Metals was liable to the carrier. *Id.*, at 23. The court rejected Metals' claim that the passage of time barred SP's recovery; although Metals lacked notice until December 1976 that the charges for the 1974 shipments had not been paid, the court noted that the applicable period of limitation was three years and that the carrier had been making efforts to locate Carco and to receive payment.

The District Court, however, went on to hold that Metals had established a valid equitable defense to SP's collection of the charges by showing that SP had failed to comply with the ICC's credit regulations promulgated pursuant to § 3(2) of the Interstate Commerce Act, 49 U. S. C. § 3(2).[4] App. 23. See 49 CFR pt. 1320 (1981). The court was not persuaded by SP's suggestion that Metals had failed to avail itself of its contractual opportunity for exoneration afforded by the non-recourse provision in the bills of lading. The court concluded: "The loss sustained by [SP] was due entirely to its own fault and negligence by failing to take the proper credit precautions when it delivered the goods to Carco. . . . I think that it is fundamentally unfair and inequitable for the defendant in this case to pay for the gross negligence of the plaintiff." App. 24. Accordingly, judgment was entered for Metals. *Id.*, at 26.

---

[4] In 1978, the Interstate Commerce Act was revised and recodified by Pub. L. 95–473, 92 Stat. 1337, as 49 U. S. C. § 10101 *et seq.* (1976 ed., Supp. III). Because the transactions at issue in this case took place prior to 1978, we refer to the Act in its prior form unless otherwise specified.

The United States Court of Appeals for the Fifth Circuit affirmed that judgment. 641 F. 2d 235 (1981). Like the District Court, the Court of Appeals acknowledged that in the absence of a valid defense, Metals must be held liable to SP for the freight charges. *Id.*, at 236. The court felt, however, that § 3(2) of the Act, the payment-before-delivery provision, provided a barrier to the carrier's collection of the charges from the consignor.[5] The implementing regulation,[6] which modified the statutory mandate by allowing for delivery of freight on credit for up to five days, nevertheless was "quite strict." *Ibid.* Thus, Metals could assert as a defense the carrier's extension of credit to Carco without adequate precautions for a period in excess of that provided by the regulation. The court concluded: "Under these circumstances, we are compelled to hold that the carrier's failure to comply with the applicable ICC regulations is a defense, available to [Metals], in an action by [SP] for unpaid freight charges." *Id.*, at 239.

---

[5] Section 3(2) reads:

"No carrier by railroad . . . shall deliver or relinquish possession at destination of any freight . . . shipment transported by it until all tariff rates and charges thereon have been paid, except under such rules and regulations as the Commission may from time to time prescribe to govern the settlement of all such rates and charges and to prevent unjust discrimination . . . ."

[6] The applicable regulation reads in pertinent part:

"The carrier, *upon taking precautions deemed by it to be sufficient to assure payment of the tariff charges within the credit periods specified in this part,* may relinquish possession of the freight in advance of the payment of the tariff charges thereon *and may extend credit* in the amount of such charges to those who undertake to pay such charges, such persons herein being called shippers, *for a period of 4 days (or 5 days* where retention or possession of freight by the carrier until tariff rates and charges thereon have been paid will retard prompt delivery or will retard prompt release of equipment or station facilities) as set forth in this part." 49 CFR § 1320.1 (1981) (emphasis added).

Because of a conflict in the decided cases,[7] we granted certiorari. 454 U. S. 1052 (1981).

## II

Since 1919, the ICC has prescribed a uniform bill of lading for use on all interstate domestic shipments of freight by rail. See *In re Bills of Lading*, 52 I. C. C. 671 (1919), modified, 64 I. C. C. 357 (1921), further modified, 66 I. C. C. 63 (1922).[8] The bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers. *Texas & Pacific R. Co.* v. *Leatherwood*, 250 U. S. 478, 481 (1919).

---

[7] In agreement with the decision of the Fifth Circuit in the present case is *Brown Transportation Corp.* v. *Atcon, Inc.*, 144 Ga. App. 301, 241 S. E. 2d 15 (1977), cert. denied *sub nom. Brown Transport Corp.* v. *Atcon, Inc.*, 439 U. S. 1014 (1978) (with two Justices dissenting). The contrary result has been reached in other cases. See, *e. g.*, *Consolidated Freightways Corp.* v. *Pacheco Int'l Corp.*, 488 F. Supp. 68 (CD Cal. 1979), and *Pennsylvania R. Co.* v. *Marcelletti*, 256 Mich. 411, 240 N. W. 4 (1932).

There is disagreement, too, as to whether equitable defenses may be asserted in various other situations where regulated carriers seek to recover lawful tariff charges. Compare, *e. g.*, *Aero Mayflower Transit Co.* v. *Hofberger*, 259 Ark. 322, 532 S. W. 2d 759 (1976), and *Westover* v. *United Van Lines, Inc.*, 154 Ga. App. 865, 270 S. E. 2d 74 (1980) (defenses upheld), with *Bartlett-Collins Co.* v. *Surinam Nav. Co.*, 381 F. 2d 546 (CA10 1967); *American Red Ball Transit Co.* v. *McCarthy*, 114 N. H. 514, 323 A. 2d 897 (1974), cert. denied, 420 U. S. 930 (1975); *Western Maryland R. Co.* v. *Cross*, 96 W. Va. 666, 123 S. E. 572 (1924); and *Arizona Feeds* v. *Southern Pacific Transp. Co.*, 21 Ariz. App. 346, 519 P. 2d 199 (1974) (defenses not recognized).

This division prompted one commentator some years ago to refer to the "striking lack of uniformity in decisions concerning the liability of consignors and consignees despite the obvious need for uniformity in interstate commercial transactions." Note, Carriers: Federal Bills of Lading: Liability of Parties to a Prepaid Shipment, 38 Cornell L. Q. 596, 603 (1953).

[8] The form of the bill of lading has been modified several times since 1922, see, *e. g.*, *In re Bills of Lading*, 245 I. C. C. 527 (1941), but only the 1921 and 1922 modifications affected the provisions of the bill of lading relevant to this case.

"Each [term] has in effect the force of a statute, of which all affected must take notice." *Ibid.* Unless the bill provides to the contrary, the consignor remains primarily liable for the freight charges. When the ICC first promulgated the uniform bill of lading, it stated:

> "The consignor, being the one with whom the contract of transportation is made, is originally liable for the carrier's charges and unless he is specifically exempted by the provisions of the bill of lading, or unless the goods are received and transported under such circumstances as to clearly indicate an exemption for him, the carrier is entitled to look to the consignor for his charges." *In re Bills of Lading*, 52 I. C. C., at 721.

This rule has not changed over time. Recently, the ICC again observed that the consignor's liability "is governed by the bill of lading contract between the parties and must be decided by interpreting that contract." *C–G–F Grain Co.* v. *Atchison, T. & S. F. R. Co.*, 351 I. C. C. 710, 712 (1976).

Clearly, then, under the contract between Metals as consignor and SP as the carrier, the consignor was primarily liable for the freight charges in question. Just as clearly, however, Metals was in a position to effectuate its release from liability by executing the nonrecourse clause in the bill of lading. Signing that clause would have operated to excuse Metals from liability. By failing to execute the nonrecourse provision, Metals continued to be primarily liable for those charges. *Illinois Steel Co.* v. *Baltimore & O. R. Co.*, 320 U. S. 508, 513 (1944); *New York, N. H. & H. R. Co.* v. *California Fruit Growers Exchange*, 125 Conn. 241, 254–255, 5 A. 2d 353, 359, cert. denied, 308 U. S. 567 (1939). See also *Louisville & Nashville R. Co.* v. *Central Iron Co.*, 265 U. S. 59, 65–67 (1924).

It is perhaps appropriate to note that a carrier has not only the right but also the duty to recover its proper charges for services performed. *Id.*, at 65–66, and n. 3. See *Pitts-*

*burgh, C., C. & St. L. R. Co.* v. *Fink,* 250 U. S. 577, 581–583 (1919). This rule of strict adherence to statutory standards is in line with the historic purpose of the Interstate Commerce Act—to achieve uniformity in freight transportation charges, and thereby to eliminate the discrimination and favoritism that had plagued the railroad industry in the late 19th century. *Midstate Horticultural Co.* v. *Pennsylvania R. Co.,* 320 U. S. 356, 361 (1943); *New York, N. H. & H. R. Co.* v. *ICC,* 200 U. S. 361, 391 (1906).

Both the District Court and the Court of Appeals correctly found that SP had established a prima facie case of Metals' liability for the freight charges in question by proving that Metals had failed to sign the nonrecourse clause. This much, indeed, is conceded by Metals. Brief for Respondent 11; Tr. of Oral Arg. 31.

## III

SP concedes that its failure to collect all freight charges from Carco before releasing the shipments violated the ICC regulation with regard to at least the first of the three shipments. *Id.,* at 4, 17. See 49 CFR § 1320.1 (1981), quoted in n. 6, *supra.* The question, then, is whether the Court of Appeals properly found that SP's violation of the regulation provided Metals with an equitable affirmative defense to SP's prima facie case.[9]

A. The ICC has comprehensively regulated the extension of credit to shippers by rail carriers. See 49 CFR pt. 1320 (1981). Yet neither the statute under which the regulations

---

[9] Metals now asserts, as well, that SP's actions violated § 7 of the Conditions of the Bill of Lading, see n. 2, *supra,* and thus constituted a complete abrogation of SP's contractual obligations under the bill of lading. See Brief for Respondent 11. SP answers that this argument was presented to neither the District Court nor the Court of Appeals. See Reply Brief for Petitioner 4. Because the Court of Appeals did not rely on this theory to grant respondent relief, and because we did not grant certiorari to consider this breach-of-contract claim, we decline to address it.

were promulgated, 49 U. S. C. § 3(2), nor the regulations themselves intimate that a carrier's violation of the credit rules automatically precludes it from collecting the lawful freight charge. Nor does either contain any words of affirmative defense to a freight charge action. Indeed, to the extent the ICC has spoken to this question, it has stated: "[A] violation of section 3(2) by [a carrier], in itself, would have had no effect on [a consignor's] responsibility for payment of undercharges." *C–G–F Grain Co.* v. *Atchison, T. & S. F. R. Co.*, 351 I. C. C., at 712. Although § 3(2) "prohibits a rail carrier from delivering freight without collecting all charges thereon[,] . . . it contains no provision shielding a consignor from liability for lawful charges." *Ibid.* Thus, at least in dictum, the ICC has suggested that "[t]he question of [a consignor's] liability [under a bill of lading] does not turn on whether any provision of the act has been violated." *Ibid.*

We view the absence of any provision for an affirmative defense in the ICC's credit regulations as an administrative construction of the statute that aids our determination of congressional intent. "[L]egislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. . . . Accordingly, caution must temper judicial creativity in the face of legislative or regulatory silence." *Ford Motor Credit Co.* v. *Milhollin*, 444 U. S. 555, 565 (1980). We so regard the administrative silence here. When an administrative agency historically has engaged in comprehensive regulation of an industry's credit practices, the agency's silence regarding an affirmative defense based on a violation of those regulations must be deemed significant.

B. The legislative and administrative history of the credit regulations further indicates that this silence was not inadvertent—the intent of the rules was to protect carriers, not to penalize them. Prior to 1918, the Federal Government did not regulate the extension of credit by rail carriers.

Wartime regulation revealed, however, that a general requirement of payment before delivery would protect the working capital of carriers and avoid discrimination among credit recipients. Cf. *Ex parte No. MC–1*, 2 M. C. C. 365, 374 (1937). After the first World War, when Congress returned the railroads to private control, § 405 of the Transportation Act, 1920, 41 Stat. 479, added paragraph (2) to § 3 of the Interstate Commerce Act. See n. 5, *supra*. The regulations adopted by the ICC in 1920 under the statute as so amended permitted railroads to extend limited credit to shippers on a nondiscriminatory basis. The regulations have remained largely unchanged to the present time. Until 1971, no court seriously suggested that a violation of the credit regulations precluded a carrier from collecting a freight charge from the party with primary liability. Instead, a defense of estoppel based on a violation of the credit regulations was held to be inconsistent with the purpose of the regulations themselves. Courts were concerned that a rule permitting selective estoppels would defeat the antidiscriminatory purpose of the Act and would weaken the capital structure of common carriers. See, *e. g.*, *Western Maryland R. Co.* v. *Cross*, 96 W. Va. 666, 673, 123 S. E. 572, 575 (1924); *Chicago Junction R. Co.* v. *Duluth Log Co.*, 161 Minn. 466, 469, 202 N. W. 24, 25 (1925); *East Texas Motor Freight Lines* v. *Franklin County Distilling Co.*, 184 S. W. 2d 505, 507 (Tex. Civ. App. 1944).

Despite the absence of any textual or historical support for an affirmative defense in either the statute or the regulations, the Court of Appeals concluded that Metals could raise SP's failure to comply fully with the regulations as an absolute equitable defense to SP's freight charge action. The Court of Appeals relied primarily on what it regarded as "a closely analogous situation," 641 F. 2d, at 237, presented in *Consolidated Freightways Corp.* v. *Admiral Corp.*, 442 F. 2d 56 (CA7 1971). On examination, however, that Seventh Circuit case plainly is distinguishable from the present one.

The defendant there was a *consignee* to whom goods had been delivered under bills of lading marked "prepaid." Relying upon the carrier's explicit representation of prepayment, the consignee paid the amount of the freight charges to the shipper-consignor. In fact, however, the carrier had extended credit to the consignor and had failed to collect the charges within the period allowed by the regulations. When the consignor went out of business, the carrier turned to the consignee for payment. The Court of Appeals, by a divided vote, held the carrier estopped.

*Admiral* differs from this case in four crucial respects. First, in *Admiral,* the carrier not only violated ICC credit regulations but also made to the defendant a material misrepresentation regarding prepayment. The carrier here, in contrast, was charged solely with failure to observe the applicable ICC credit regulations. Second, in the Seventh Circuit case, the consignee-defendant had paid full freight charges to the consignor. Had the Seventh Circuit also awarded relief to the carrier, it would have "require[d] an innocent consignee to defray freight charges exactly double the amount contemplated by the applicable tariffs." 442 F. 2d, at 65 (Stevens, J., concurring). Here, the defendant paid no freight charges; thus, an award of relief to the carrier creates no possibility of enforcing a double payment.

Third, in *Admiral,* the grounds for equitable estoppel were created by the consignee's payment of freight charges in detrimental reliance on the carrier's misrepresentation. The carrier's violation of the credit regulations offered only "additional grounds for the intervention of the principles of equity." *Id.,* at 60 (majority opinion). In this case, there is no suggestion that the consignor knew of, or changed its position detrimentally in reliance on, the carrier's credit violation. Fourth, and most significant, the defendant-consignee in the Seventh Circuit case had no means by which to protect itself from freight charge liability. In this case, of course, the defendant-consignor could have protected itself com-

pletely simply by signing the nonrecourse clause in the bills of lading.

C. Finally, public policy concerns disfavor judicial implication of affirmative defenses based on carrier violations of the Commission's credit regulations. We recognize that the regulations are technical. Thousands of railcars are delivered every day by the country's railroads. See Association of American Railroads, Yearbook of Railroad Facts 25 (1981) (approximately 62,000 deliveries per day). Almost inevitably, some cars will be delivered to noncredit patrons, some freight bills will be sent out late, and some accounts will not be collected within the specified time. A 1966 study by the ICC's Bureau of Enforcement found that almost a third of 15,751 bills examined were overdue and that over half of those overdue were delinquent more than 10 days. See *In re Regulations for Payment of Rates and Charges,* 326 I. C. C. 483, 485 (1966).[10] After appraising this data, the ICC agreed that "the evidence establishes many and continued violations of the credit regulations. However, we are unable to conclude on this record that rigid rules . . . would provide a practical or desirable solution. [T]here are many reasons for credit violations which are beyond correction by rules, e. g., where shippers have unexpected peak workloads, where there are controversies over amounts due, where additional information is needed such as weights or evaluations, where standard office procedures are in the process of change, where temporary cash flow problems occur, and where it becomes necessary to check the validity of charges with third persons. Stringent credit rules . . . would destroy the flexibility needed to meet problems of this nature." *Id.,* at 489–490. Indeed, in 1980, the ICC proposed repealing the credit regulations altogether, noting that "apparent, wide-

---

[10] The methodology of this study was questioned by the railroads. The roads' own figures, however, showed that of 445,984 collectible items accrued during the period of the investigation, more than 10,000 resulted in credit violations. 326 I. C. C., at 486.

spread noncompliance with the regulations indicates that the payment periods and other time limits prescribed are simply not realistic for many of the situations in which they apply." *Ex parte Nos. MC–1, 73, 143, and 170,* 45 Fed. Reg. 31766.

It thus appears that the Court of Appeals in the present case implied an affirmative defense that would penalize railroads for violations of the credit regulations just as the agency responsible for administering those regulations was pronouncing them unrealistic. The prospect raised for the carrier is that it will be barred from recovering lawful freight charges, even from a consignor who fails to execute the nonrecourse clause, for possibly unavoidable violations of the credit rules. "The obvious consequence would be to discourage [carriers] from extending credit where the operation of this rather difficult statute is in doubt." *Bruce's Juices, Inc. v. American Can Co.,* 330 U. S. 743, 753 (1947). Ironically, those shippers who pay their bills currently in a responsible manner would suffer as a result.

Metals argues that a ruling for SP places SP "in the unrealistic position of being incapable of doing any wrong" and therefore creates "no incentive [for carriers] to improve inefficient and careless credit practices." Brief for Respondent 12. Metals further claims that the loss at issue here would not have occurred if SP only had complied with its obligations under the regulations. *Id.,* at 24. The answer to this is that the ICC has ample authority to police the credit practices of carriers and thereby to deter improper practices. This authority includes the power to issue a cease-and-desist order, see *Shaw Warehouse Co. v. Southern R. Co.,* 308 I. C. C. 609, 633–634, 637 (1959), appeal dism'd *sub nom. Southern R. Co. v. United States,* 186 F. Supp. 29 (ND Ala. 1960); the power to seek a federal-court injunction requiring a carrier to comply with the regulations, see *ICC v. All-American, Inc.,* 505 F. 2d 1360 (CA7 1974); and the power to bring suit for the $5,000 civil forfeiture, provided by 49 U. S. C. § 16(8) and 49 U. S. C. § 11901(a) (1976 ed., Supp.

III), for each knowing violation of an order of the Commission, see, *e. g., United States* v. *Western Pacific R. Co.,* 385 F. 2d 161 (CA10 1967), cert. denied *sub nom. Denver & R. G. W. R. Co.* v. *United States,* 391 U. S. 919 (1968); *United States* v. *Pennsylvania R. Co.,* 308 F. Supp. 293 (ED Pa. 1969).

Thus, the ICC may regulate the credit practices of carriers even without the judicially created remedy of forfeiture of freight charges. Furthermore, a reading of the cited cases reveals that the question whether a credit violation has occurred often will require the ICC or the courts to conduct a factual inquiry as to the carrier's intent to violate the regulations. The "credit violation defense" adopted by the Court of Appeals requires a carrier to forfeit freight charges without regard to the nature of its violation.[11] This inflexible ap-

---

[11] The facts of this case illustrate the problems that may arise when a court ventures to create law in this highly technical field. The rulings of the District Court and the Court of Appeals denied SP recovery not only for the first car, which was delivered without any payment upon the freight charge, but also for the two cars for which it did demand payment before delivery and received checks for the charges.

Yet acceptance of a proper check as payment for a freight charge is an acknowledged commercial practice in the railroad industry. See *Fullerton Lumber Co.* v. *Chicago, M., St. P. & P. R. Co.,* 282 U. S. 520, 522 (1931); see also 49 CFR § 1320.13 (1981). It therefore is at least possible that SP's insistence on payment by check before releasing the second and third cars constituted compliance with the regulations, which require only that the railroad take "precautions deemed by it to be sufficient to assure payment of the tariff charges." 49 CFR § 1320.1 (1981). It is true, of course, that the check for one car was understated by $900, but, as has been noted, SP mailed a freight bill for the correct amount to Carco within four days of the delivery. See 49 CFR § 1320.5 (1981) (carrier may extend credit for up to 30 days on balance due in the event of undercharges).

Furthermore, it is by no means clear that SP could safely have deferred delivery of the second and third cars until after Carco had paid the charges on the first car. The carrier's lien for unpaid charges covers only the goods in the immediate shipment. 49 U. S. C. § 105. See *Atlas S.S. Co.* v. *Colombian Land Co.,* 102 F. 358, 361 (CA2 1900). Once Carco offered to pay the charges on the second and third cars, even serious suspicion

proach disenables courts from considering the carrier's intent, the degree of the shipper's fault, the effect of enforcement on the carrier's existing permissible credit practices, and other subjective factors in deciding whether or not to enforce a shipper's primary liability for freight charges.

Metals also advances a number of "double payment" cases in support of its claim for an affirmative defense.   See, *e. g.*, *Southern Pacific Transp. Co.* v. *Campbell Soup Co.*, 455 F. 2d 1219 (CA8 1972); *Consolidated Freightways Corp.* v. *Admiral Corp.*, 442 F. 2d 56 (CA7 1971); *Farrell Lines, Inc.* v. *Titan Industrial Corp.*, 306 F. Supp. 1348 (SDNY), aff'd, 419 F. 2d 835 (CA2 1969), cert. denied, 397 U. S. 1042 (1970); *Southern Pacific Co.* v. *Valley Frosted Foods Co.*, 178 Pa. Super. 217, 116 A. 2d 70 (1955).   To be sure, these cases speak in equity terms.   But none of these cases turned solely on a carrier's violation of credit regulations.   Each and all of them involved a carrier's misrepresentation, such as a false assertion of prepayment on the bill of lading, upon which a consignee detrimentally relied only to find itself later sued by the carrier for the same freight charges.   We find that these double payment cases constitute their own category and stand against the placement of duplication of liability upon an innocent party.   See *Consolidated Freightways Corp.* v. *Admiral Corp.*, 442 F. 2d, at 65 (Stevens, J., concurring).

As we have noted above, no similar double payment liability is in prospect here.   Metals, not the carrier, selected the consignee.   Furthermore, Metals has been paid for its goods while the carrier has not been paid for its services.   The carrier unsuccessfully has pursued its remedies against the consignee before turning to the shipper-consignor for payment. Nor had the statute of limitation run when SP finally sued Metals for payment.

---

about Carco's financial health might not have allowed SP to withhold delivery without risking liability to Carco for conversion of its goods.   See 49 U. S. C. § 88 (carrier's duty to deliver goods on demand).

We, of course, are in no position to condone slipshod collection practices and a carrier's violation of the governing regulations. But the terms of the bill of lading are specific and clear. Metals' failure to execute the nonrecourse provision in the bill of lading specifically placed upon it primary liability for the freight charges. To permit SP's violation of the credit regulations to be raised as an affirmative defense to its prima facie case would serve to nullify the enforceability of the nonrecourse clause. Nor do we believe that judicial implication of such a defense is necessary to encourage carrier compliance with credit rules. Railroads have real economic incentives to collect their freight charges from consignees insofar as they are able. The remedies for a carrier's violations of the regulations are best left to the ICC for such resolution as it thinks proper.

We therefore hold that the Court of Appeals erred by permitting Metals to assert an affirmative defense against SP based on its violation of the ICC credit regulations. Such "equities" as may exist by virtue of the carrier's delay and its violation of the credit regulations are insufficient in magnitude to overcome the time-honored rule that under such circumstances, no "act or omission of the carrier (except the running of the statute of limitations) [will] estop or preclude it from enforcing payment of the full amount by a person liable therefor." *Louisville & Nashville R. Co.* v. *Central Iron Co.*, 265 U. S., at 65.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*