**FLOTA MERCANTA GRAN COLUMBIANA, S.A., and E.S. Binnings, Inc., Plaintiffs-Appellants,**

v.

**FLORIDA CONSTRUCTION EQUIPMENT INC., and Alonso Shipping Co., Defendants-Appellees.**

No. 85–3357.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1986.

Michael W. Lodwick, O'Neil, Eichin & Miller, I. Matthew Williamson, New Orleans, La., for plaintiffs-appellants.

Roger H. Fellom, New Orleans, La., for Alonso Shipping Co.

Marvin Lewis, Miami, Fla., for Florida Const.

Before GOLDBERG, WILLIAMS and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellee, Florida Construction Equipment, Inc., (Florida) contracted to sell two used asphalt plants to two Colombian companies, Sociedad de Ingenieria y Construccion Sico Ltda. and Pavimentos Vias e Ingenieria Paving Ltda. (collectively, consignees). Florida contracted with appellant, Flota Mercante Gran Columbiana S.A. (Granco) to transport the plants from New Orleans to Barranquilla, Colombia aboard Granco's ship M/V CUIDAD DE PEREIRA. Appellant, E.S. Binnings, Inc. (Binnings), acted as vessel agent for Granco and was responsible for receiving the plants and loading them aboard Granco's vessel in New Orleans. Florida engaged Alonso Shipping Co. (Alonso), as freight forwarder to transport the plants from Amite, Louisiana to Binnings' wharf in New Orleans, and to prepare bills of lading and other documentation for the shipment. Appellants filed this action against appellees to recover freight charges for transporting the plants. The district court, following a bench trial, denied recovery. We reverse.

## I.

In February 1980 the consignees agreed to purchase two asphalt plants from Florida for a total price of $120,000. The parties agreed that Florida would ship the plants from New Orleans to Barranquilla, Colombia freight collect. The consignees agreed to pay the freight when the cargo was delivered in Barranquilla. The consignees established irrevocable letters of credit in favor of Florida at Banco Mercantil in Bogota for the purchase price of the plants. Florida was entitled to collect on these letters of credit upon delivery of the cargo to the consignees.

In early May 1980, Alonso transported the disassembled asphalt plants by truck from Amite to Binnings' wharf in New Orleans and Alonso gave Binnings dock receipts for each of the plants. Alonso did not furnish the measurements of the plants to Binnings at the time of delivery.

A few days later, Alonso obtained measurements of the cargo from Mario Estrada, a Florida employee. Estrada reported to Alonso that the two plants measured a total of 25,248 cubic feet. Alonso recorded these measurements on two short form bills of lading which it submitted to Binnings. Binnings accepted these figures without remeasuring the plants.

Binnings commenced loading the asphalt plants aboard Granco's ship on June 4, 1980. Under the applicable tariff, the freight charge for carriage of the plants from New Orleans to Colombia according to the measurements Alonso recorded on the bill of lading was $103,621.93.

After the plants were loaded aboard the ship, Binnings' wharf manager and ship superintendent reviewed the vessel's manifest and realized immediately that the measurements were incorrect; the plants occupied more than twice the amount of space aboard ship the Alonso figures reflected they would. Because the cargo of other shippers could not be delayed, Granco's ship sailed as scheduled despite the discrepancy.

Binnings determined through its own calculations that the cargo measured 69,396 cubic feet rather than 25,248 cubic feet as reported by Alonso; thus Binnings determined that the total freight due was $282,498.59, instead of $103,621.93, the sum computed from Alonso's measurements.

The freight collect cargo arrived in Colombia on June 9, 1980, and Granco notified the consignees that they could pick up the cargo upon payment of the freight. Because Granco insisted that the consignees pay freight as computed from Binnings' measurement of the cargo, the consignees refused to accept the cargo. Florida learned of the dispute when the consignees' bank refused to honor Florida's letters of credit for the purchase price of the plants.

Two surveys of the plants were conducted while the plants were in the possession of Colombian customs officials. The first surveyor, acting for Granco, measured the

plants to be 62,542 cubic feet. The second, acting for Florida, measured the plants at 35,003 cubic feet.

Despite extensive negotiations between Granco and the consignees during the two months after the cargo arrived in Colombia, they were unable to reach an agreement and the asphalt plants remained on the dock. At the end of August 1980, representatives of Granco and the consignees met at Granco's Bogota office to make a last ditch effort to resolve the dispute. Following this meeting the parties announced that the dispute had been resolved and that Granco would accept $103,621.93 from the consignees in exchange for release of the cargo. Granco promptly made demand on its agent Binnings to pay the balance of the freight it considered due. Granco charged Binnings with negligence in failing to discover the error in Alonso's measurements. Although Binnings denied culpability, it paid Granco $155,080.71 which represented the additional freight due as computed from the 62,542 cubic feet measurement of the plants by Granco's surveyor in Bogota plus the surveyor's fee. Granco subrogated Binnings to all its rights and claims for the uncollected freight against Florida, Alonso and the consignees.

Binnings and Granco filed this suit against Florida and Alonso to recover the additional freight due predicated on the larger measurements of the cargo and survey expenses associated with the additional measurements. The district court denied relief to the plaintiffs and this appeal followed. Appellants contend that the district court erred in (1) refusing to impose liability on Florida for freight charges under the bills of lading; (2) holding that Granco released the consignees; (3) holding that a release of the consignees and the cargo operated as a discharge of Florida and Alonso; and (4) holding that such a release is valid under the Shipping Act.

## II.

### A.

The district court, relying on *Louisville & Nashville Railway Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900 (1924), concluded that although Florida was presumed liable for the freight, it had successfully rebutted that presumption. We disagree with the district court's interpretation of *Louisville & Nashville*. The Court in *Louisville & Nashville* predicated its holding that the shipper was only *presumed* liable for the freight on the language in the bill of lading that governed that case: "[T]he owner or consignee shall pay the freight...." Even though the bill of lading did not expressly require the shipper to pay the freight, the court reasoned that the shipper was nevertheless presumed liable for the freight because "the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf; and the promise by him to pay therefor is inferred...." *Id.* 265 U.S. at 67, 44 S.Ct. at 442. The Court simply held that the liability of the shipper for freight charges is dependent on the language of the particular bill of lading: "The tariff did not provide when or by whom the payment should be made. As to these matters carrier and shipper were left free to contract...." *Id.* at 66, 44 S.Ct. at 442. In *Southern Pacific Transportation Co. v. Commercial Metals*, 456 U.S. 336, 342–43, 102 S.Ct. 1815, 1820–21, 72 L.Ed.2d 114 (1982), the Supreme Court reaffirmed this principle: "The bill of lading is the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers.... Unless the bill provides to the contrary, the consignor remains primarily liable for the freight charges."

▐ The bill of lading issued by Granco in this case as contrasted to the bill of lading in *Louisville & Nashville*, expressly requires the shipper to pay the freight:

> The shipper and consignee shall be jointly and severally liable to the carrier for the payment of all freight, charges and other amounts due the carrier and for any failure of either or both to perform

his or their obligations under the terms of this bill of lading and to indemnify the carrier against and hold it harmless from all liability, loss, damage and expense which the carrier may sustain or incur arising or resulting from any such failure or performance by the shipper and consignee or either of them.

*Louisville & Nashville* therefore does not support Florida's argument that the shipper is only presumptively liable for the freight and the district court erred in adopting Florida's argument in this respect. Thus, Florida is responsible to Granco for the balance of the freight due under the express terms of the controlling bill of lading. We now turn to Florida's alternate arguments that Granco's release of the consignees for the freight discharged Florida and that Granco, by releasing the cargo and accepting a portion of the freight from the consignees, waived its right to collect the balance from Florida.

### B.

■ The district court's finding that Granco released the consignees in return for the $103,621.93 it received from them is supported by the record and is not clearly erroneous. Under the general maritime law, however, a release of one co-debtor does not result in the discharge of other co-debtors unless the parties intend such a result. *Cates v. United States*, 451 F.2d 411 (5th Cir.1971). The district court made no finding that Granco intended to release Florida and our review of the record fails to disclose record support for such a finding. We conclude therefore that the release of the consignees did not operate to release Florida.

■ Florida next argues that Granco's release of the consignees and the cargo without collecting the full freight due "amounts to a waiver of its right to collect the additional freight from the shipper." Brief of Appellee at 11. Both parties rely on *Southern Pacific Transportation Co. v. Commercial Metals Co.*, 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982). In that case, Southern Pacific was the delivering carrier which transported three rail

cars of steel from the shipper, Commercial Metals to Carco, the consignee. The bill of lading provided that the consignor would be liable for the freight unless it signed a non-recourse statement in the bill of lading which Commercial Metals failed to sign.

Section 3(2) of the Interstate Commerce Act prohibited the carrier from delivering the cargo to the consignee until all freight charges were paid. Regulations promulgated under this section of the Act permitted the carrier to rely on the consignee's credit instead of demanding cash on delivery if the carrier investigated the consignee's credit in advance. Southern Pacific delivered at least one of the cars of steel to Carco without receiving payment and without investigating Carco's credit as required by the regulations. More than thirty months after Carco defaulted on its obligation to pay the freight, Southern Pacific notified Commercial Metals of Carco's default and demanded payment from Commercial Metals. Commercial Metals declined to pay the freight charges and the litigation followed. The court of appeals held that the bill of lading imposed liability on the shipper, Commercial Metals, for the freight but that Southern Pacific was not entitled to recover from Commercial Metals because Southern Pacific delivered the cargo without obtaining payment for the freight or taking the required precautions for extending credit.

The Supreme Court agreed with the lower courts that the bill of lading imposed liability on the shipper, Commercial Metals, for the freight. But the Court rejected the implication of an affirmative defense to the shipper based on the carrier's failure to obtain payment from Carco or check its credit in violation of the regulations. The Court concluded by holding that:

[T]he Court of Appeals erred by permitting Metals to assert an affirmative defense against SP based on its violation of the ICC credit regulations. Such "equities" as may exist by virtue of the carrier's delay and its violation of the credit regulations are insufficient in magnitude to overcome the time-honored rule that under such circumstances, no "act of omission of the carrier (except the run-

ning of the statute of limitations) [will] estop or preclude it from enforcing payment of the full amount by a person liable therefor."

*Southern Pacific*, 456 U.S. at 352, 102 S.Ct. at 1825.

In summary, *Southern Pacific* teaches that: (1) a carrier has a right and a duty to collect its freight charges against any party liable for them; and (2) courts should be reluctant to imply affirmative defenses in favor of a shipper which is contractually obligated to pay the carrier's freight bill.[1] *Southern Pacific* is indistinguishable in principle from today's case and controls its outcome. Both Southern Pacific and Granco failed to comply with an obligation to collect the freight from their consignees. A statute imposed this obligation on Southern Pacific; Granco assumed this obligation when it accepted a freight collect shipment. In both cases the shipper suffered financial harm as a result of the carrier's omission. But the Supreme Court concluded that the failure of the carrier to collect the freight or verify the consignee's credit did not provide the shipper with a defense to the carrier's claim for the freight charges. Similarly, no affirmative defense is available to Florida because of Granco's failure to collect the freight from the consignees.

## CONCLUSION

The district court, without determining how much freight was due on the shipment

of the asphalt plants in addition to the sum Granco collected from the consignees, concluded that Granco was not entitled to recover any additional sums. We disagree with this determination for the reasons stated above and accordingly reverse the judgment entered in favor of Florida and remand this case to the district court for further proceedings consistent with this opinion.

1. The Court in *Southern Pacific* did not foreclose implication of an affirmative defense to the shipper or consignee in the so called "double payment" cases. *See Southern Pacific Transp. Co. v. Campbell Soup Co.*, 455 F.2d 1219 (1972); *Consolidated Freightways Corp. v. Admiral Corp.*, 442 F.2d 56 (1971); *Farrell Lines, Inc. v. Titan Industrial Corp.*, 306 F.Supp. 1348 (S.D.N. Y.), *aff'd*, 419 F.2d 835 (1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970); *Southern Pacific Co. v. Valley Frosted Foods Co.*, 178 Pa. Super. 217, 116 A.2d 70 (1955).

These cases typically arise in two ways. In some cases the carrier accepts freight from a freight forwarder which has collected the freight from the shipper. The carrier extends credit to the freight forwarder, who defaults and the carrier attempts to collect the freight from the shipper. In other cases the carrier extends credit to the shipper and marks the

shipment prepaid. The consignee, relying on the carrier's representation that the freight is paid, pays the freight to the shipper. When the shipper refuses to pay the freight to the carrier, the carrier seeks to recover from the consignee. The Court distinguished these cases:

Each and all of them involved a carrier's misrepresentation, such as a false assertion of prepayment on the bill of lading, upon which a consignee detrimentally relied only to find itself later sued by the carrier for the same freight charges. We find that these double payment cases constitute their own category and stand against the placement of duplication of liability upon an innocent party. *See Consolidated Freightways Corp. v. Admiral Corp.*, 442 F.2d at 65 (Stevens, J., concurring).

*Southern Pacific*, 456 U.S. at 351, 102 S.Ct. at 1824.