UNITED VAN LINES INC., Plaintiff,

v.

Stuart HELLMAN, Defendant.

No. 94–CV–4600 (TCP).

United States District Court,
E.D. New York.

March 21, 1996.

---

George W. Wright, New York City, for plaintiff.

Stuart Hellman, Northport, NY, Thomas Keane, Yonkers, NY, for defendant.

### ORDER

PLATT, District Judge:

On September 15, 1995, United Van Lines, Inc. ("UVL"), by its attorneys, moved this Court for an Order pursuant to FED. R.CIV.P. 56 granting summary judgment in favor of plaintiff and against defendant, Stuart Hellman, in the sum of $2,959.45 together with interest and costs thereon. On the same date, Mr. Hellman, by his attorneys, cross-moved this Court for an Order either (1) pursuant to FED.R.CIV.P. 12 dismissing this action for lack of subject matter jurisdiction, or (2) pursuant to FED.R.CIV.P. 8 allowing amendment of defendant's answer. For the reasons stated below, Defendant's motions are denied and Plaintiff's motion for summary judgment is granted.

### I. Background

On or about August 15, 1991, Aaction Moving & Storage ("Aaction") issued on behalf of UVL Uniform Household Goods Bill of Lading and Freight Bill No. 253–620–91 ("Bill of Lading") covering the transportation of Hellman's goods from Littleton, Colorado to Melville, New York. Specifically, the Bill of Lading: (1) incorporates by reference the terms and conditions of UVL's Household Goods Carriers' Bureau Tariff ICC HGB 400–H which was filed with the Interstate Commerce Commission ("ICC") and effective at the time of the shipment; (2) identifies Hellman as both shipper and consignee of the shipment; (3) provides that Hellman, as both shipper and consignee, would be "liable for all unpaid charges payable on account of the shipment in accordance with the applicable tariffs . . ."; (4) contains no quotation for the storage of Hellman's goods; and (5) was signed by Hellman on that date.

To accommodate Hellman's request for delayed delivery, UVL placed the goods in a leased trailer on which they were to be held for delivery on August 30–31, 1991. After the trailer was loaded and picked up by UVL from Hellman's residence in Littleton, Colorado the trailer was transported to the facility of UVL's destination household goods agent, Hall–Lane Moving & Storage, Inc. ("Hall–Lane"), in Commack, New York to await delivery to Hellman on August 30–31, 1991.

On or about August 30, 1991, Hellman telephoned both UVL and Hall–Lane to notify them that he could not accept delivery until the end of September. UVL advised him that his goods would have to be removed from the leased van by September 4, 1991. On September 3, 1991, Hellman was once again advised by UVL that his goods would have to be removed from the trailer and stored at a place of his choosing or at Hall–Lane's facility. Despite having been notified, Hellman did not remove his goods. Hellman's goods were subsequently unloaded from the leased truck on September 5, 1991 and placed in storage at Hall–Lane's warehouse in Commack.

On August 12, 1991, prior to taking delivery of his goods, Hellman had paid UVL the sum of $8,550.00 to cover UVL's interstate tariff charges by charging that amount over two different credit cards. When Hellman's goods were delivered to his new residence on October 9, he paid $5,107.45 to cover Hall–Lane's local storage, handling, and transportation charges. It is undisputed that these latter charges are separate and distinct from UVL's charges and are in no way implicated in this case.

Hellman later successfully applied for a charge back on one of his credit cards in the sum of $2,959.45 with respect to his pre-shipment payment of UVL's interstate freight charges. According to Hellman, the sum of $2,959.45 represents the difference between Hall–Lane's destination storage and delivery charges and the oral storage rates allegedly quoted by Aaction representative Rose to him prior to the shipment.

The instant action is being brought by UVL to recover the interstate freight

charges allegedly due and owing from Hellman.

## II. Discussion

### A. Jurisdictional Issues:

As a preliminary matter, Hellman challenges the jurisdiction of this Court. Specifically, Hellman alleges that this dispute implicates UVL in its capacity as warehouseman, not as an interstate motor carrier, and, therefore, short of meeting the requirements for diversity jurisdiction, this matter does not belong in federal court. Hellman's characterization of this dispute and, by extension, the conclusion he draws from it is clearly incorrect.

It is a truism, albeit one with significant consequences, that federal courts are courts of limited jurisdiction, and that they are "empowered to hear only such cases as are within the judicial power of the United States, as defined by the Constitution, and have been entrusted to them by a jurisdictional grant by Congress." CHARLES A. WRIGHT, LAW OF FEDERAL COURTS 27 (1994). There are at least two jurisdictional grants by Congress to the federal courts that are germane to this case: (1) 28 U.S.C. § 1331 confers jurisdiction to the federal district courts of all "civil actions arising under the Constitution, laws, or treatises of the United States."; and (2) 28 U.S.C. § 1337(a) confers jurisdiction to the federal district courts of all actions arising under federal law regulating interstate commerce, including interstate carrier claims for freight charges. *Thurston Motor Lines v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983).

██ Under the facts present here, it is plainly apparent that jurisdiction does exist. It is undisputed that this case involves: (1) the shipment of goods in interstate commerce; (2) a shipment governed by a tariff filed with the ICC; and (3) charges that are allegedly due and owing in connection with an interstate shipment of goods. Because this litigation arises under federal law in the most fundamental way, this Court has jurisdiction to hear this case. Accordingly, defendant's motion to dismiss this case for lack of subject-matter jurisdiction must be, and hereby is, denied.

### B. Legal Framework:

Title 49 and its accompanying regulations require interstate motor common carriers to file a schedule of the charges for their services with the ICC. 49 U.S.C. § 10762. The Interstate Commerce Act ("the Act") requires that carriers may only assess the filed rates. 49 U.S.C. §§ 10741, 10744, 10761(a). In pertinent part the Act provides:

> [E]xcept as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide the transportation or service is contained in a tariff that is in effect under this subchapter. *That carrier may not charge or receive a different compensation for the transportation or service than the rate specified in the tariff,* whether by returning a part of that rate to a person, giving a person a privilege, allowing use of the facility that affects the value of that transportation or service, or another device. (emphasis added).

This insistence that only filed rates be assessed serves important public purposes, namely to prevent price discrimination by carriers and unlawful preferences among their customers. *Pittsburgh, Cincinnati, Chicago and St. Louis Railroad Co. v. Fink,* 250 U.S. 577, 581, 40 S.Ct. 27, 28, 63 L.Ed. 1151 (1919). Carriers, shippers, and consignees are legally bound by the provisions of a duly filed tariff which may not be waived by the carrier. Indeed, this scheme does not permit either a shipper's ignorance or the carrier's misquotation of the applicable rate to serve as a defense to the collection of the filed rate. *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 126, 110 S.Ct. 2759, 2765, 111 L.Ed.2d 94 (1990).

These filed tariffs are, in turn, incorporated into a bill of lading which serves as the contract of carriage in the interstate freight shipment context. The bill of lading is ". . . the basic transportation contract between the shipper and the carrier; its terms and conditions bind the shipper and all . . . carriers . . . each (term) has in effect the force of

statute of which all affected must take notice." *Southern Pacific Transportation Co. v. Commercial Metals Co.*, 456 U.S. 336, 342–343, 102 S.Ct. 1815, 1820–1821, 72 L.Ed.2d 114 (1982). It is well-accepted that a bill of lading may not be modified by extrinsic or parol evidence.

### C. *Application:*

Hellman attempts to beat back this motion for summary judgment by two principal means. First, he argues that UVL's insistence on the application of the filed-rate doctrine to recover sums withheld by Hellman is self-serving as even the "agreed-upon" price, as reflected by the Bill of Lading, is itself less than what the applicable tariffs require.[1] Second, he attempts to place this dispute outside the filed-rate doctrine by characterizing it as not one over interstate freight charges, but over an alleged oral storage agreement entered into by Hellman with Aaction, UVL's agent in Denver. Both arguments are not well taken and must surely lose.

Hellman initially attempts to defeat this summary judgment motion by advancing an argument that the charge is illegal because UVL did not charge him more than it did. In its reply papers on these motions, UVL indicates that it will be happy to charge Hellman the tariff rates and, of course, there is nothing to prevent Hellman from paying the tariff rate. Indeed, were we to vitiate the negotiated rate we would have to replace it with and enforce the tariff rate.

Nor does Hellman's second argument provide a shield against UVL's summary judgment motion. Hellman claims that Aaction representative Mitch Rose orally agreed that Hellman's goods would remain in Colorado for possible long-term storage. Since Hellman does not allege that UVL agreed to store his goods for a period in excess of 180 days, his storage claim is governed by the storage-in-transit provisions of UVL's filed

tariffs and federal law.[2] (La Presta Reply Aff. ¶¶ 4–5). Given the law that the Bill of Lading and the applicable tariffs constitute the contract of carriage between Hellman and UVL, any storage terms to which UVL can be bound would have to be reflected in the Bill of Lading. The Bill of Lading signed by Hellman on August 15, 1991, provides for the loading of Hellman's goods on August 15, 1991 onto a trailer at Littelton, Colorado and delivery of the same to Melville, New York on August 30–31, 1991. It is significant to note that (1) there was absolutely no indication that Hellman wanted storage in Colorado; (2) the storage-in-transit section on the Bill of Lading was left conspicuously blank; and (3) no warehouse receipt was issued to Hellman.

Realizing that existing documentation does not support his version of the story, Hellman attempts to argue that parol evidence supports the existence of this alleged oral storage agreement. Any evidence, however, of such a purported oral agreement for storage of the goods for an unspecified period or beyond August 31, would render the Bill of Lading delivery date a nullity and constitute a material alteration of the shipping terms. Moreover, it is well-settled that a Bill of Lading may not be varied by extrinsic or parol evidence. This Court must, and hereby does, decline to give Hellman a better deal than he negotiated for himself.

### *Conclusion:*

For all the foregoing reasons, Defendant's motion to dismiss is denied and Plaintiff's motion for summary judgment in the sum of $2,959.45 together with interests and costs thereon is granted.[3] Defendant's alternative request to amend his answer is likewise denied.

SO ORDERED.

---

1. It is undisputed that UVL is an ICC certificated interstate motor carrier.

2. The Court is not bound by the opinion of ICC Transportation Industry Analyst Frances G. Worden that Hellman's complaint did not involve temporary storage which would be covered by the filed tariff. That conclusion seems to have been based on inaccurate and/or incomplete information. (Letter from Worden to Hellman of 5/18/92).

3. This was the relief requested in the complaint.