**FLOTA MERCANTE GRANCOLOMBIANA, S.A. and E.S. Binnings, Inc., Plaintiffs,**

v.

**FLORIDA CONSTRUCTION EQUIPMENT, INC. and Alonso Shipping Company, Defendants.**

Civ. A. No. 81–1349.

United States District Court, E.D. Louisiana.

May 15, 1985.

Michael W. Lodwick, New Orleans, La., for plaintiffs.

Roger H. Fellom, New Orleans, La., for defendant Alonso Shipping Co.

Marvin Lewis, Miami, Fla., for defendant Florida Const. Equipment, Inc.

## MEMORANDUM OPINION

CASSIBRY, Senior District Judge:

In this case plaintiffs Flota Mercante Grancolombiana, S.A. [Granco], an ocean carrier domiciled in Colombia, S.A., and E.S. Binnings, Inc. [Binnings], a Louisiana corporation, Granco's vessel agent in the Port of New Orleans, New Orleans, Louisiana, and Granco's subrogee and assignee, seek to recover alleged unpaid freight charges for Granco's carriage of two used, disassembled asphalt plants from the Port of New Orleans to the Port of Barranquil-

la, Colombia aboard Granco's M/V CIUDAD DE PEREIRA in June 1980. The defendants are Florida Construction Equipment, Inc., [Florida], a Florida corporation, the shipper, and Alonso Shipping Company [Alonso], a Louisiana corporation, Florida's freight forwarder. The freight charges appearing on the bills of lading for the two asphalt plants, a total of $103,621.93, were paid by or on behalf of the consignees in Colombia upon release of the cargo to them. The plaintiffs seek to recover from the defendants an additional sum of $155,080.71 demanded of the consignees and which they refused to pay. This additional sum is based on alleged corrected cubic measurements of the asphalt plants. The plaintiffs also seek to recover the sum of $1,852.88, an expense of Granco in causing a survey of the cargo after discharge in Barranquilla, plus attorney's fees and costs.

The defendant shipper, Florida, and the defendant freight forwarder, Alonso, deny any liability for the alleged additional freight and survey charges claimed. Florida filed a cross-claim against Alonso. Alonso filed a cross-claim against Florida and a counterclaim against Binnings.

The Court has jurisdiction under 28 U.S.C. § 1333 and 28 U.S.C. § 1331.

## FACTS

In February 1980 Florida arranged for the purchase of two used, disassembled asphalt plants in Amite, Louisiana for two companies in Bogota, Colombia, Sociedad de Ingenieria y Construccion Sico Ltda. [SICO] and Pavimentos Vias e Ingenieria Paving Ltda. [PVIP]. Luis E. Varela, president of Florida, went to Amite with the Colombian companies' representative, Senor Raphael Forero, to examine the two plants. Forero approved the plants for purchase and Varela made an agreement with the owner, Stanley Anderson, for Florida's purchase of them and gave a deposit, the balance to be paid within 30 days. The agreement between Varela and Forero was that the sale from Florida to Forero's companies would be "FOB New Orleans", and the plants would be shipped to Barranquilla, Colombia "Freight Collect."

Varela then commenced arrangements for shipment of the two plants to Colombia. He contacted by telephone Admiral Carlos Vasquez in Miami, Florida, the representative of Granco in Miami, and informed him of the purchase agreement with Forero and proposed the carriage of the asphalt plants by Granco to Colombia. He requested Vasquez to send someone to Amite to obtain information on which cost of the freight could be ascertained for the benefit of the negotiations between Florida and Forero. He further informed Vasquez that Granco should send two containers to Amite for the shipment of the loose parts of the plants. Vasquez told him that, since the shipment would originate in New Orleans, Louisiana, Granco's representative in New Orleans, Ignacio Restrepo, would be handling the shipment and that he should deal directly with Restrepo.

Information as to the cost of the freight was given to Varela which was acceptable to him and Forero in their negotiations, a total purchase price of $120,000 for the two plants was agreed upon, a container for the small parts was dispatched to Amite, and Varela retained Alonso as Florida's freight forwarder for the shipment.[1] Alonso notified Binnings, Granco's vessel agent, of the shipment of asphalt plants and of their expected arrival at the wharf in New Orleans sometime in May. By the end of March the Colombian buyers of the two asphalt plants had established irrevocable

---

1. Varela testified that Vasquez gave him the information as to the cost of the freight, and Restrepo notified him of that also. He further testified that Vasquez informed him that Granco's Bogota office would contact Forero to confirm the freight and get Forero's approval, and that Granco would investigate Forero's credit responsibility. Vasquez denied in his deposition testimony introduced at trial having given Varela any freight cost information, and denied having even discussed the matter with Varela. Neither Restrepo nor Forero testified at the trial. It is inconceivable that Florida and Forero would have concluded their transaction without having from Granco at least an estimate of the freight cost. Varela's testimony that the specific figure of $103,000.00 was given to him as the cost of the freight is rejected however for reasons which will be discussed more fully infra.

letters of credit with Banco Mercantil, Bogota, Colombia in favor of Florida for the price of each plant. Florida was advised of the establishment of these irrevocable letters of credit by export credit advices issued by Flagship National Bank of Miami.

Alonso as freight forwarder for the shipper Florida had the duty to prepare all of the documentation required for the shipment and to deliver it to Granco's vessel agent Binnings. Binnings provided to Alonso Granco's document forms necessary to ship the cargo in compliance with the tariff of the East Coast Colombia Conference of which Granco is a member.[2] Generally Binnings performs all of the functions that Granco would perform in the Port of New Orleans, if Granco operated there without a vessel agent. It receives from freight forwarders the prepared bills of lading, dock receipts and other paperwork necessary for the shipment of cargo from one port to another; it maintains and operates the First Street Wharf, a preferential berth assignment from the Board of Commissioners of New Orleans; it arranges for or actually performs stevedoring services, including the loading and stowing of cargo aboard vessels; it receives and stores cargo for loading aboard vessels and receives and stores cargo discharged from vessels; it calculates freight due on shipments of cargo, and collects freight due from shippers and freight forwarders.

In the normal handling of a shipment of cargo a discrepancy of the magnitude claimed in this case between the freight charges in the bills of lading and the calculations of freight subsequently made does not occur. No one involved with the shipment of these two asphalt plants had ever known of such a large discrepancy. Because of the manner in which the documentation was handled, the discrepancy was not discovered until the asphalt plants were loaded aboard ship.

Commencing the first week in May the first of 25 shipments of the asphalt plants was delivered by truck to the First Street Wharf without any delivery papers. Normally a freight forwarder sends a dock receipt before delivery of the cargo, or the cargo delivered to the dock is accompanied by a dock receipt, describing the cargo and giving its weight and measurements. Binnings' personnel on the dock accepted the cargo only after clearing the matter with the booking clerk in the main office, and then misidentified the shipment as used sugar mill machinery. The remaining truckloads delivered through May 30 also were not accompanied by dock receipts or by any other delivery papers.

As the machinery was delivered it was measured by clerks belonging to the International Longshoreman's Association and assigned to work for Binnings and stored on the First Street wharf. The clerk's linear measurements were given to the desk clerk and he kept them in a file on the dock. According to Binnings' Director of Stevedore Operations, Donald H. Harrell, the purpose of measurement of the cargo by the ILA clerks was to evaluate the size of the cargo for its loading aboard ship.

On May 16 the Binnings' office received from Alonso two dock receipts, one for each of the asphalt plants. The disassembled pieces were described and a number was given to each. The information as to gross weight and measurement which the freight forwarder should have included was lacking.[3] Binnings allowed this irreg-

---

**2.** In accordance with the requirements of the Shipping Act, 46 U.S.C. § 814, Granco, as the operator of vessels between ports of the United States and Colombia, belongs to the association of common carriers whose vessels call at Colombia ports. Whenever Granco carries cargo between a port in the United States and a port in Colombia, its performance is regulated by the Federal Maritime Commission in accordance with the statutory requirements of the Shipping Act and the regulations promulgated thereunder. Conferences such as the East Coast Colom-

bia Conference are required to file with the Federal Maritime Commission a tariff which establishes the freight rates the carriers belonging to the conference charge for various categories of cargo. The carrier must charge the freight rate and collect the total amount of freight called for by the tariff.

**3.** The evidence does not reveal when these irregular dock receipts were transmitted from Binnings' downtown office to the First Street Wharf. On June 2 M. LaFrance, the desk clerk

ular practice to be followed in this shipment as an accommodation to Alonso, whom it had known and done business with for many years, because it knew Alonso had little information about the plants which were being dismantled and delivered piecemeal.

Alonso obtained the information as to the parts of the asphalt plants listed on the two dock receipts from packing lists mailed to it about the middle of May by an employee of Florida, Mario Estrada, after Alonso informed Estrada that it needed packing lists for the two plants. Florida sent Estrada to Amite Louisiana to make a complete inventory and prepare packing lists with a number given to each part so that no parts of the plants would be lost. The packing lists Estrada prepared showing the name of each part and the number given to it are in evidence. Estrada is no longer an employee of Florida, cannot be located, and did not testify at the trial.

Mary Mire, an employee of Alonso in New Orleans, prepared and forwarded to the Binnings' office a short form bill of lading for each asphalt plant.[4] Having only Estrada's packing lists, she lacked information as to weight and measurement of the cargo which Alonso as freight forwarder was obligated to supply on behalf of the shipper Florida to the carrier Granco. She called Estrada in Amite and informed him of her need for weights and measurements to prepare the bills of lading. By telephone he gave weight and measurements in cubic feet for each part listed on the packing lists, and Mire penned by hand that information on copies of the list. She then tallied the figures given to her by Estrada for each plant and thus obtained the figures she entered on the bills of lading. Bill of Lading # ZF–23 for SICO's asphalt plant showed a cubic measurement of 11,168 feet; Bill of Lading # ZF–24 for PVIP's asphalt plant showed 14,080 cubic feet, for a total of 25,248 cubic feet for the two plants.[5]

The consignee named in each bill of lading was the Banco Mercantil in Bogota, Colombia, and the notify party was the corporate purchaser of the plant in Bogota. On each bill of lading Mary Mire typed "FREIGHT COLLECT".[6]

On June 3 Binnings commenced loading the M/V CIUDAD DE PEREIRA, and when it was ascertained that the vessel would have enough space after the loading of the general cargo to accommodate the two asphalt plants, they were loaded also. The decision that the vessel would have sufficient space was made by a manager on the wharf after visual inspection of the plant parts and a visual comparison with the space on the vessel without reference to the cubic measurements on the bills of lading or the linear measurements kept on file on the dock. The loading of the asphalt plants commenced on June 4.

The Binnings office filled in and signed on June 4 that portion of the bills of lading

on the wharf, signed the dock receipts on behalf of "Various Clerks" acknowledging receipt of the parts of the two asphalt plants listed on the dock receipts.

4. The bills of lading do not show the date of their preparation. Binnings first scheduled the shipment of the asphalt plants on a vessel which was departing New Orleans on May 28, but the last truckload was not delivered to the First Street Wharf until May 30 and that sailing was missed.

5. The evidence does not reveal how Estrada arrived at the measurements he transmitted to Mire. Estrada was not sent to Amite to measure or weigh the asphalt plants, according to Florida's president Luis Varela, and he had no equipment for performing such tasks. Varela did not understand that Florida had any obligation to weigh the cargo because Granco was to measure it, and he surmised that Estrada obtained the figures he gave to Mire from Granco's measurements. No Binnings' employee who was interrogated about the matter had any knowledge of whether a Granco employee was sent to Amite, and Granco's only employee who testified was not interrogated about this matter in his deposition which was introduced at trial.

6. Early in the negotiations between Florida and Granco, Restrepo had questioned whether this used machinery should be shipped freight collect, and Vasquez, with the concurrence of Granco's office in Bogota, had resolved the issue by allowing it because Florida had shipped used machinery several times "freight collect" from Miami to Colombia without any freight collection problem.

relating to the ocean rates and charges, and calculated that $50,332.23 was owed for carriage of SICO's plant and $62,163.64 for PVIP's, a total of $112,495.87.

The vessel's manifest prepared in Binnings' office from the bills of lading for all of the cargo indicated the identities of all the shippers and consignees of cargo loaded aboard the vessel, the description of such cargoes, and the measurements of those cargoes as reflected on the bills of lading. The manifest was sent to the wharf to move with the vessel. When the manifest was received at First Street Wharf on June 5, the day the vessel's loading was completed, showing a total cubic measurement of the two asphalt plants as 25,247 feet, the master of the vessel, the wharf manager and the ship superintendent all realized that the manifest was in error because more than twice that space had been used to load the plants.

Prior to receipt of the manifest no one at First Street Wharf had any reason to anticipate that the bills of lading prepared by Alonso would not reflect substantially correct measurements of the asphalt plants. No one in Binnings' office was aware that the cubic measurements on the bills of lading were much less than the cubic measurements produced by extending to cubic feet the linear measurements taken by the ILA clerks on the wharf. These were the circumstances which caused the asphalt plants to be loaded without prior discovery of the discrepancy.

The vessel sailed on schedule on June 5. It would have been commercially unfeasible to hold the vessel in port while the parties involved were notified of the discrepancy because the shipments of the other shippers would have been detained also. The customary practice when a discrepancy occurs is to utilize freight correction notices to correct freight charges after vessels have sailed.

The day after the vessel sailed the file on the wharf for the Florida shipment was sent to Binnings' downtown office. A clerk wrote the individual measurements taken by the stevedore clerks for each asphalt plant on a sheet of paper and attached the sheet to the appropriate dock receipt. These measurements were then extended in the office to cubic measurements which showed that the plant parts covered by Bill of Lading # ZF–23 measured 23,791.6 cubic feet, those covered by Bill of Lading # ZF–24 measured 37,561.69 cubic feet, and the container of small parts included in Bill of Lading # ZF–23 measured 980 cubic feet, for a total of 62,333.-29 cubic feet, a discrepancy of 37,085 between these measurements and the total of the measurements in the bills of lading prepared by Alonso.[7]

Granco was notified by Binnings of the discrepancy, but not Alonso nor Florida. Binnings requested that Granco have the cargo surveyed by an independent surveyor on outturn in Colombia. The discrepancy of such a magnitude was so unusual that Binnings did not consider it could have been a good faith mistake. Binnings had been doing business with Alonso for many years with no previous experience of unfair dealing, but here there was a strong feeling that Binnings had been knowingly and willfully misled.

The M/V CIUDAD DE PEREIRA arrived at the Port of Barranquilla, Colombia on June 9. The two asphalt plants were offloaded and placed in the custody of Colombian customs officials. Granco's Bogota office advised the notify parties SICO and PVIP that the cargo had been delivered to customs and was available for pickup upon payment of the freight due. Florida presented to the bank the shipping documents necessary to collect on the letters of credit for the purchase price of the plants, the bills of lading, etc., and the bank refused to pay under the letters of

---

7. These figures were given by Gerald Hanlon, Jr., Vice-president of Binnings in his testimony. A stipulation was entered into by the parties during trial to the effect that the ILA clerks, who made the measurements as the truckloads of parts were delivered, would testify, if called, that the measurements shown on the sheets attached to the two dock receipts were the measurements made by them.

credit. Florida was thus informed of the problem as to the amount of freight due.

Binnings issued two freight correction notices, unrelated to the discrepancy in measurements, on June 11. A recent rate reduction had been overlooked in rating Florida's cargo on the bills of lading submitted by Alonso. The revision of the tariff granted shippers of used machinery a ten percent across-the-board rate reduction. The June 11 freight correction notices sent to Alonso advised Florida that with the ten percent reduction, the total freight and other charges under the Bill of Lading # ZF–23 in the amount of $50,332.23 were reduced to $46,301.04, and those under the Bill of Lading # ZF–24 in the amount of $62,163.64 were reduced to $57,320.89, or a total of $103,621.93.

Binnings first decided that it would not send any documentation regarding the discrepancy in measurements until the survey on outturn was completed. When the survey was not made within two weeks, Binnings prepared on June 27 two freight correction notices. One freight correction notice advised that the correct total cubic feet under the Bill of Lading # ZF–23, showing 11,168 cubic feet, was 29,628 cubic feet, with freight under the tariff and other charges due in the amount of $121,096.35. The other freight correction notice advised that the correct total cubic feet under the Bill of Lading # ZF–24, showing 14,080 cubic feet, was 39,768 cubic feet, with freight under the tariff and other charges due in

the amount of $161,402.24. According to the advices in these freight correction notices, the total cubic measurement for the two plants was 69,396 feet, as compared to 25,248 cubic feet shown on the bills of lading prepared by Alonso, and the total freight due was $282,498.59, as compared to $103,621.93 computed on measurements on Alonso's bills of lading.[8]

The survey of the plants in Colombia was completed in early July showing a total measurement of 62,542 cubic feet for the two plants. Granco advised Binnings that it was having discussions with the consignee about the freight due and Binnings had no further contact from Granco about the discrepancy until September 1980. A second survey of the plants was made in Colombia in August 1980 for Florida or for the notify parties on the bills of lading, and the results of this survey showed that the two plants had a cubic measurement of 35,003 feet.[9]

The two asphalt plants were released by Granco to SICO and PVIP in September 1980 apparently upon the payment by PVIP of an amount which would be $57,320.89 in U.S. dollars and by SICO of an amount which would be $46,301.04 in U.S. dollars, a combined total of $103,621.93.[10] At the end of August or the first of September before their release, a meeting was held in the Bogota offices of Granco between Senor Lopez, an employee of Granco in its collection office in Bogota, and Senor Forero, the representative of SICO and

---

8. No explanation appears in the evidence for the discrepancy between the total of the extended measurements made by Binnings according to the testimony of Gerald Hanlon of 62,333.29 cubic feet and the total measurement of 69,396 cubic feet shown on Binnings' two freight correction notices of June 27.

9. Binnings' witnesses explained that the type of cargo involved here is difficult to measure precisely because of the irregular contour of the pieces. Two people measuring the same pieces may find different measurements.

10. The payments were made under facturas [invoices] dated June 16, 1980 which are obviously based on Binnings' freight correction notices of June 11, 1980. Ninety-five percent of the amount of each invoice is expressed in U.S. dollars, five percent in pesos. Each factura is stamped "CANCELLADA" by Granco. The

plaintiffs agreed at trial that Forero had paid "$103,000 plus" to Granco. Florida was never able to obtain through its discovery efforts against Binnings and Granco the documentation involved in the release of the cargo in Colombia. When Florida sought to have the plaintiffs' claim dismissed for their failure to make discovery, Granco responded by agreeing to be dismissed. As a nominal party to the suit (subrogor of Binnings) it objected to incurring any expenses for discovery and objected to being compelled to bring its personnel from Bogota to New Orleans to give depositions. Florida replied to this tactic by opposing the voluntary dismissal of one plaintiff, labelling it as a continuation of plaintiffs' deliberate policy of crippling Florida's defense preparations by refusing to make discovery.

PVIP, and attended by Luis Varela at the invitation of Forero. Varela's purpose in attending the meeting was to have the freight problem resolved so that he could collect on the letters of credit for the purchase price of the plants.

Lopez insisted at the meeting that he had to collect all of the freight due under the corrected measurements of the plants.

Forero refused to pay the freight Lopez demanded, pointing out that he could have chartered a vessel to transport the plants for half the price. At that point Forero and Lopez had a private meeting for about 30 minutes. When they emerged Lopez told Varela that the problem had been resolved and Granco would accept $103,-000.00 for the freight.[11] After this amount

11. The course of the meeting is shown only by the testimony of Luis Varela. Neither Forero nor Lopez testified at the trial and neither was deposed. The many unsuccessful efforts to obtain their testimony is revealed by discovery pleadings in the record.

On August 17, 1982 Florida moved to *compel* the deposition of Senor Raphael Forero by telephone, pleading that this lawsuit had created financial distress for it, and that forcing it to pay the cost of travel to Colombia to take Forero's deposition would create undue financial hardship upon it. Granco and Binnings opposed the motion essentially on two grounds:
1. Taking of a deposition by telephone was an unsatisfactory way of obtaining Forero's testimony;
2. The motion was filed past the discovery cutoff date of August 2, 1982 and was therefore untimely.
Magistrate Kenneth C. Hughes heard the motion on August 18 and apparently was at first inclined to grant the motion, but denied it because it was filed past the discovery deadline. On August 27 Florida moved for *permission* to take Forero's deposition by telephone for use at trial. Granco and Binnings opposed the motion as one already denied and therefore moot and a waste of the Court's time, and contended again that it was filed past the discovery deadline. The motion set for hearing on September 1 was denied by the Magistrate.

On August 30 Florida moved for an appeal from the Magistrate's ruling of August 18 to be heard at the pretrial conference on September 2, stressing the need for Forero's testimony regarding the issues in the case. At the pretrial conference on September 2 counsel for plaintiffs and defendant Florida represented to the Court that the discovery posture of the case indicated a continuance of the trial would be in the interest of justice. The trial set for September 9 was continued to January 17, 1983. Discovery was reopened with a cutoff date of December 10, 1982. Counsel agreed that, in the event depositions were noticed in Bogota, Colombia, each party would pay its own costs in connection therewith, the loser in the case to bear those expenses ultimately as costs. The appeal from the Magistrate's ruling of August 18 was dismissed as moot.

On August 20, 1982 Florida noticed the deposition of Senor Jose Lopez for August 30 at the law offices of counsel for Florida in New Or-

leans. The deposition apparently was not taken on that date. On or about September 21 Granco and Binnings noticed the deposition of Lopez on October 6 at Granco's offices in Bogota. On or about September 21 Florida noticed the deposition of Lopez on October 4 at the offices of Florida's counsel in New Orleans. Florida moved to quash Granco's deposition of Lopez noticed for October 6 in Bogota.

Magistrate Hughes on September 29 quashed the deposition of Lopez noticed by Granco and Binnings in Bogota and the deposition of Lopez noticed by Florida in New Orleans pending a hearing on another motion of Florida to dismiss plaintiffs' suit for their failure to make discovery. Florida appealed from the ruling, contending that Florida was in necessitous circumstances and Granco should produce its corporate officers in New Orleans where the suit had been brought. The appeal was heard on October 13 at the same time Florida's motion to dismiss for failure to make discovery was heard and submitted. On November 24 the Court issued an order specifying the discovery Granco and Binnings were to comply with to avoid dismissal and set the matter for January 5, 1983 for further consideration of Florida's motion to dismiss.

On December 6 Florida filed a motion to expedite the Court's ruling on its motion to review the Magistrate's order of September 29, quashing all depositions noticed, and urged that discovery should be ongoing and not stayed pending resolution of its motion to dismiss. On December 8 Magistrate Hughes was directed to reconsider his ruling of September 29 quashing depositions while the motion to dismiss was pending. On that same day Magistrate Hughes permitted the taking of a 30(b)(6) FRCP deposition, to be noticed in New Orleans on a date agreed upon by counsel before December 25.

On December 9 Florida noticed the deposition of Granco in New Orleans on December 16 and moved that Senor Lopez be designated as Granco's representative at the deposition because he was the only employee who could testify regarding the facts and circumstances concerning the release of the cargo in Colombia. On December 20 the deposition was renoticed for December 27. On December 20 Florida also noticed the depositions of Senor Forero and Senor Lopez in Bogota on January 4, 1983.

On December 29 counsel for Florida moved to withdraw as counsel of record because Florida

was paid by the consignees the plants were released and Florida collected from the bank under its letters of credit the purchase price of the plants.

In a letter from the General Manager of Granco, Alvaro Diaz S., to Binnings on September 10, 1980, Binnings was advised of a discrepancy in the freight due on the two asphalt plants according to the remeasurement in Barranquilla as compared with the amount collected from SICO and PVIP. Although no specific figure was given for the amount of its collection, Granco related that the importers had paid only the original freight noted by Binnings on the bills of lading. Diaz recited that Granco had almost two months of conversations and negotiations with the importers and they had categorically refused to pay any amounts above those in the bills of lading despite Granco's Legal Department's "extreme efforts." Nothing was said in the letter to explain the importers' position during the extended negotiations or their reasons for refusing to pay *any* additional freight. Diaz related merely, "The importers threatened to abandon the shipment if they were forced to pay the additional charges." Based on Granco's analysis of the problem, Diaz further informed Binnings that Granco had concluded there was negligence and fault on the part of Binnings' personnel in not correcting the error at the time of loading, and demanded that Binnings pay the value of the additional freight, $155,080.71 ($69,017 for SICO's Bill of Lading ZF–23, $86,063.21 for PVIP's Bill of Lading ZF–24), plus the costs of the remeasurement, $1,852.88, a total of $156,933.59.

Stapled to the letter when it was introduced into evidence are two credit notes on forms for the adjustment of freight, dated September 3, 1980, issued by the Conference and Tariffs Section of Granco, one to SICO for Bill of Lading ZF–23 in the amount of $69,017.52, and one to PVIP for Bill of Lading ZF–24 in the amount of $86,063.22 with the explanation on each, "Adjustment of freight resulting from: Cancellation additional account by authorization of the General Manager." The credit notes reflect that they relate to invoices dated August 18, 1980. Each credit note contains the following instruction: "Please issue the corresponding Correction Note for freight in accordance with this Credit Note."

Binnings replied to the Diaz letter, denying any culpability on its part in the matter of the freight discrepancy, and giving its opinion that the provisions of the Bills of Lading, the Conference Tariff and the Carriage of Goods by Sea Act gave Granco adequate means for full recovery against the "shippers/receivers", and urged Granco to pursue a course of legal action. Binnings did not prevail in this exchange, and on October 14, 1980 it paid to Granco the sum demanded, $156,933.59. On the same day Granco and Binnings entered into a Release and Subrogation agreement whereby Granco subrogated Binnings to all its rights and claims to the uncollected freight against "Florida Construction Equipment, Inc., the Consignee, or any firm or corporation."

On November 25, 1980 Binnings made a demand on Florida by letter for additional freight due for shipment of the two asphalt plants according to its freight correction notices of June 27, 1980, $178,876.66, plus the cost of the remeasurement survey, $1,852.88, a total of $180,729.54. Florida responded to Binnings on December 4, disclaiming any responsibility as shipper for the freight charges, alleging that it had sold to its customer "FOB New Orleans",

had been unable to pay previously incurred costs and attorneys' fees and was unable to pay prospective costs and attorneys' fees. The motion to withdraw as counsel was granted on January 3, 1983. The trial and the motions pending in January 1983 were then continued.

Florida's motion to dismiss was set for further consideration on March 2, 1983. Florida made no appearance and the motion was denied.

Florida was without counsel of record until June 1983 when out-of-state counsel was permitted to appear and represent Florida. The record does not reveal any further efforts by Florida, Binnings or Granco to obtain the deposition testimony of Senor Forero or Senor Lopez before the trial in January 1984.

and had never undertaken to pay freight charges for the shipment.

Granco and Binnings filed this suit against Florida and Alonso on April 6, 1981.[12]

## POSITIONS OF THE PARTIES

The plaintiffs Granco and Binnings essentially take the position that they should recover the amount of the freight discrepancy against defendants Florida and Alonso because—

1. The law requires the carrier to charge freight according to the rate in its filed tariff;

2. The law requires a carrier to collect according to the tariff;

3. The law obligates the shipper without exception to pay freight in accordance with the tariff;

4. The law obligates the freight forwarder to pay freight charged in accordance with the tariff as a joint and several obligor with the shipper when the freight forwarder has caused credit to be extended by the carrier.

The plaintiffs further contend that Florida also has a contractual obligation to indemnify them for the loss they sustained as a result of its erroneous information on the bills of lading as to the measurement of the cargo.

Florida takes the position

1. A lump sum or fixed price of approximately $103,000.00 was agreed upon among Granco, the carrier, Florida, the shipper, and Forero, the representative of the consignees, and if that sum was a deviation from the tariff, it was incumbent upon Granco to obtain the necessary approval from the East Coast Colombia Conference for the deviation;

2. It was the intention of Granco, Florida and Forero that the consignees were the parties primarily liable for the freight;

3. The dispute as to the additional freight was wholly resolved by Senor Lopez and Senor Forero, and any obligation to pay the additional freight was extinguished by Granco's stamp "Cancellada" on the facturas dated June 16, 1980.

Alonso's position is that it acted only as the agent of its disclosed principal Florida, provided only information given to it by Florida, never undertook in any way to assume personal responsibility for the freight, and incurred no liability under the contract between Granco and Florida for the freight.

## THE ISSUES

### GENERAL RULES ON THE OBLIGATION TO PAY FREIGHT

■ A carrier must charge the rate appearing in its filed tariff.[13] A carrier has a legal duty to recover freight properly due.[14] The freight must be paid by the person or persons liable therefor regardless of mistake, inadvertence, or unequitable conduct of the carrier or its agents.[15] There is a rebuttable presumption that the

---

**12.** The plaintiffs have vaccillated in the amounts they seek to recover for additional freight. In the original complaint they demanded $155,080.71 based on the Barranquilla measurements. In the amended complaint filed on June 25, 1982 they demanded $178,876.66 also allegedly based on the Barranquilla measurements, but in fact this figure is the exact sum resulting from deduction of the amount paid by the consignees from the amount due according to the freight correction notices issued by Binnings on June 27, 1980. In plaintiffs' proposed Findings of Fact and Conclusions of Law they propose a recovery of $178,876.66. In their post-trial memorandum they speak of recovery of $155,080.71.

**13.** Shipping Act of 1916, 46 U.S.C. §§ 815, 816, 817(b)(3). The provisions of the Shipping Act

of 1916 were modeled on those of the Interstate Commerce Act, 49 U.S.C. §§ 10101 *et seq.*, and it is now well settled that "Congress intended that the two acts, each in its own field, should have like interpretation, application, and effect." *United States Navigation Co. v. Cunard S.S. Co.,* 284 U.S. 474, 481, 52 S.Ct. 247, 249, 76 L.Ed. 408 (1932).

**14.** *Southern Transportation Co. v. Commercial Metals Co.,* 456 U.S. 336, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982). A carrier is exposed to civil penalties if it does not collect the freight due under the applicable tariff. 46 U.S.C. § 815.

**15.** *United States v. Seatrain Lines, Inc.,* 370 F.Supp. 483 (S.D.N.Y.1973); *Bartlett-Collins Co. v. Surinam Navigation Co.,* 381 F.2d 546 (10th Cir.1967).

shipper is primarily liable for freight.[16] This presumption may be rebutted by proof, by the bill of lading or other evidence, that the parties intended that the consignee should assume the primary liability and the shipper should assume only a secondary liability, or that the consignee should assume the liability entirely and the shipper should not assume any liability whatsoever for payment of the freight charges.[17] The clause "freight collect", of itself, on the bill of lading is insufficient to rebut the presumption and relieve the shipper of its primary liability to pay the freight.[18]

## LUMP SUM OR FIXED PRICE FOR THE FREIGHT CHARGES

■ Florida did not prove that a fixed price or lump sum for the freight charges were agreed to by it, Forero and Granco. Luis Varela testified that the agreed price in February or March was $103,000.00. The total of the amounts of freight charged in the freight correction notices of June 11, and the amounts paid by the consignees for release of the cargo was also approximately $103,000.00. The amounts in the freight correction notices were a result of the application of a ten percent rate reduction made effective in May 1980 to the charges in the Bills of Lading dated June 4 in the amount of $112,495.87. That the amounts of the freight correction notices was also the amounts allegedly agreed upon as the price of the freight, is too much of a coin-

cidence to be believed under these circumstances.[19]

If an agreement for a fixed price had been made it would appear to be reasonable for the freight forwarder and the carrier's vessel agent to be made aware of such an agreement. Alonso prepared its documents as a measured cargo shipment under the tariff, and Binnings completed the bills of lading submitted by Alonso under the same preparation. More than likely the early discussions about the amount of the freight were discussions of estimates within the tariff, and these discussions would have concerned only Varela and Forero in their negotiations for sale of the two plants, thus there was no reason to convey these discussions to Alonso or to Binnings.

## PARTIES LIABLE FOR THE FREIGHT CHARGES

■ The evidence preponderates to the effect that the consignees, and not the shipper nor the freight forwarder, were liable for the freight charges. The pertinent parts of the East Coast Colombia Conference Freight Tariff F.M.C. No. 3, effective March 26, 1979, under which the asphalt plants were shipped, and the long form bill of lading applicable to their carriage effectively create a presumption that a shipper is the party primarily liable for the freight charges, or at the least is presumed to be jointly and severally liable with the consignee and forwarding agent for them.[20]

**16.** *Southern Pacific Transportation Co. v. Commercial Metals Co.,* 641 F.2d 235 (5th Cir.1981).

**17.** *Louisville & N.R. Co. v. Central Iron & Coal Co.,* 265 U.S. 59, 44 S.Ct. 441, 68 L.Ed. 900 (1924), and cases cited therein; *Med-Span Shipping Services, Ltd. v. Jerry Jones Jack, Inc.,* 442 F.Supp. 904 (S.D.N.Y.1978).

**18.** *Consolidated Freightways Corporation of Delaware v. Pacheco International Corp.,* 488 F.Supp. 68 (C.D.Ca.1979).

**19.** Granco agrees that a departure from the tariff to permit a fixed price to be agreed upon by the carrier and the shipper is possible if consent of the other parties to the Conference is obtained. No application to the Conference for such a departure was made in this case.

**20.** Rule No. 7 of the tariff:

> Freight and other charges provided for in this tariff must be paid in full by the shipper and his authorized freight forwarder, if any, as billed upon receipt of the goods for carriage and tender of the Bill of Lading by the Carrier; provided, that a carrier may, in its discretion, extend credit to a shipper or, when credit is requested or accepted by a freight forwarder who arranges shipment on behalf of a shipper, to the shipper and his authorized freight forwarder jointly and severally, for a period not to exceed fifteen (15) working days excluding Saturdays, Sundays and legal holidays from the date of sailing of the vessel from the port at which the cargo was loaded....

Appointment by a shipper of a freight forwarder shall be deemed to be an assumption by the shipper of joint and several liability with the freight forwarder for payment of all freight and

The evidence is sufficient to overcome the presumption created by the tariff and the bill of lading. The circumstances of the sale and shipment and the conduct of the parties show that it was the understanding of Granco, Florida, SICO and PVIP that SICO and PVIP, not Florida nor Alonso, would be liable for the freight charges. The sales of the asphalt plants were made F.O.B. New Orleans, which placed title to them in the buyers at the time of shipment. They were shipped "freight collect" to the consignees.[21] When the consignees refused to pay the additional freight demanded, all of the negotiations were between Granco and Forero, who was representing the consignees, and Granco never approached Florida as a liable party.

At the meeting in Bogota immediately before the release of the plants no efforts to collect from Florida were made. Varela testified that the negotiations at that meeting were between Lopez for Granco and Forero for the consignees. He was present at the invitation of Forero so that he could learn for himself the great demand for additional freight which was holding up Florida's collection of the purchase price. The plaintiffs produced no witness to contradict Varela. In fact the letter of Dr. Diaz to Binnings dated September 10, 1980 confirms that no effort was made to collect the freight from Florida after the shipment arrived in Colombia. The English translation of the letter written in Spanish reads in part as follows:

"Regarding the payment of sea freight for these shipments, I wish to inform you that after almost two months of conversations and negotiations with the importers, only a few days ago did they pay the original freight, based on the measurements noted by yourselves on the Bills of Lading. They categorically refused to pay any additional amounts despite the fact that our Legal Department tried by all means to collect without any results. The importers threatened to abandon the shipment if they were forced to pay the additional charges.  * * * "

The inference is clear that Granco understood that SICO and PVIP were liable for the freight charges, and not Florida.

A further circumstance which reenforces this inference is the fact that Granco did not follow the directive of its tariff as to shippers and freight forwarders who are delinquent in the payment of freight charges. In Rule No. 7 carriers are directed as follows:

"The Carriers will immediately notify the Conference Office of each and every failure by a shipper/forwarder to pay freight and/or other charges within the period allowed by the Carrier for payment [15 working days from the date a vessel sails in case of a credit shipment]. The name of the delinquent shipper/forwarder will be circulated by the Conference Office to all of the Carriers and no further credit will be extended by any of the Carriers to such shipper/forwarder until all delinquent freight and other

other charges. A request for, or acceptance of, credit by a freight forwarder shall be deemed to be an agreement by the forwarder to assume joint and several liability with the shipper for payment of all freight and other charges. No freight forwarder is or shall be the agent of a carrier for collection of freight or other charges; and any freight forwarder shall be dealt with by the carriers only as the agents of the shipper for payment of such charges.

. . . . .

Carriers may accept payments in Colombia of all freight charges due, in which case such charges shall be collected 95% in United States dollars at the official "Capital Market" rate of exchange, plus any Colombian taxes and 5% in peso. Bills of lading shall be claused "Freight Collect."

The Bill of Lading:
The shipper and consignee shall be jointly and severally liable to the carrier for the payment of all freight, charges and other amounts due the carrier and for any failure of either or both to perform his or their obligations under the terms of this bill of lading and to indemnify the carrier against and hold it harmless from all liability, loss, damage and expense which the carrier may sustain or incur arising or resulting from any such failure of performance by the shipper and consignee or either of them.

21. All parties have treated the Banco Mercantil as a nominal consignee only. When the word "consignee" is used it refers to the buyers of the plants, who were named as the notify parties in the bills of lading.

charges have been paid and the Conference Office and Carriers so notified." Varela testified that he had never received any notice that he had been placed on a delinquent list and the plaintiffs produced no evidence to rebut his testimony.

The determination on this issue is sufficient to decide the claim for additional freight in favor of the defendants, but, in the event a different view would be held on appeal of the case, the further issue of the effect of the release of the cargo will also be determined.

## THE EFFECT OF THE RELEASE OF THE ASPHALT PLANTS

Granco and Binnings contend that, when Granco accepted payment of a total of $103,621.95 from SICO and PVIP and released the asphalt plants to them, Granco was merely minimizing its damages, and not extinguishing the entire obligation for the freight claimed to be due. Florida contends that Granco's marking of the facturas of June 16, 1980 "Cancellada" means that the obligation for the additional freight claimed was extinguished as well as the claims totalling $103,621.95 in the facturas. Florida introduced the depositions of several experts to prove that, if a part of the amount claimed for freight is paid and the cargo is released, the entire amount claimed is extinguished. These depositions are not sufficient to make that proof under the circumstances of this case.

The facturas marked "Cancellada" clearly include only that freight covered by the bills of lading of June 4, 1980, as corrected by the freight correction notices of June 11. Stamping those facturas "Cancellada", meaning "Paid", only signifies that the indebtedness covered by those facturas were paid. The testimony of Florida's experts are insufficient to expand the meaning of "Paid" to a greater obligation than that shown on the facturas.

The facts relating to the release of the cargo were not brought before the Court by the participants Granco and Forero. The Court does not have the benefit of the testimony of Lopez or Forero and, although the Court emphasized to the plaintiffs on several occasions that every document relating to this shipment should be furnished to the defendant Florida, there is an extreme likelihood that there was less than full compliance with this admonition.

It is inconceivable that Forero, a businessman, who was so determined not to pay the additional freight that he threatened to abandon the plants, would accept them without having proof that the obligation for the additional freight was extinguished. Marking "Paid" on any instrument would not have been the way to accomplish this, because the consignees did not in fact "pay" the additional freight. The logical way to extinguish the obligation would have been for Granco to give the consignees "Credit" for the additional freight which they refused to pay.

There is some evidence introduced by the plaintiffs indicating that this was the manner in which the consignees' obligations for the additional freight were extinguished. Stapled to Dr. Diaz's letter to Binnings when it was introduced into evidence are two credit notes in favor of SICO and PVIP for the exact amounts of the additional freight claimed from each. These are dated September 3, 1980 and refer to facturas dated August 18, 1980. The following explanation of the credit notes is stated: "Adjustment of freight resulting from: Cancellation of additional account by authorization of the General Manager." The credit notes are on a form which contains the directive: "Please issue the corresponding Correction Note for freight in accordance with this Credit Note."

Dr. Diaz's letter indicates that he enclosed a photocopy of the Certificate of Remeasurement [the Bogota remeasurement], but does not indicate that the credit notes were enclosed. No witness was examined about the credit notes and they were not mentioned in the post-trial memorandum of any party. The Court requested supplemental memoranda from all parties for comments on the significance of these credit notes.

The plaintiffs comment that these credit notes were internal bookkeeping proce-

dures to indicate that the receivables indicated on the credit notes were being charged to Binnings. There is no mention on these notes that the purpose was to create a debit to Binnings. The plaintiffs attempt to supply this lack by arguing that the word "ANDULADA", meaning "VOID", appearing in a column labelled "AMENDED LIQUIDATION" under the "BREAKDOWN" part for the adjustment of freight indicated that Binnings account was to be charged with the additional freight. This attempt fails. The column labelled "INITIAL LIQUIDATION" contains the full amount of the additional freight claimed. The column labelled "AMENDED LIQUIDATION" would contain the word "VOID" because there was in fact no amended liquidation in this instance.

A more likely explanation for Dr. Diaz having included these credit notes in his letter would be to demonstrate to Binnings that Granco had given up on collecting the additional freight charges from the consignees and was authorizing that they be given credit for the claims. This explanation is consistent with Varela's testimony that Forero or Lopez or both of them told him at the end of their meeting that the whole matter was resolved. Forero then made it possible for Florida to collect from the bank the purchase price of the asphalt plants. Forero, acting as a responsible representative for SICO and PVIP, would not have permitted Florida to be paid its purchase price with claims against SICO and PVIP for the additional freight charges remaining outstanding.

■ I infer from the credit notes that Granco gave SICO and PVIP credit for the additional freight, and extinguished their obligations.[22] This is an additional ground for denying plaintiffs relief against Florida and Alonso.

Plaintiffs argue that any agreement by Granco to release the consignees from the obligation to pay the additional freight would be null and void as a violation of the Section of the Shipping Act, 46 U.S.C. § 815, which prohibits agreements granting undue and unreasonable preference or advantage to a particular person or description of traffic, citing *Southern Pacific Co. v. Miller Abattoir Co.*, 454 F.2d 357, 359 (3d Cir.1972). There is no evidence to indicate that Granco's release of the consignees was done to grant to them any undue or unreasonable advantage. Granco negotiated with great persuasion for two months to collect the freight it claimed to be due. Dr. Diaz's letter to Binnings reveals that the asphalt plants were released only after the consignees threatened to abandon them if Granco continued to insist upon collecting the additional freight claimed. These circumstances mitigate against the categorization of the extinguishment of the claims for the additional freight as null and void agreements.

## RIGHT OF THE CARRIER TO BE INDEMNIFIED BY THE SHIPPER

■ The plaintiffs contend that Granco's failure to collect the correct freight due on the shipment of the asphalt plants was caused by Florida's breach of its obligation as shipper under COGSA and the Bill of Lading to provide to Granco correct information as to the measurement of the cargo, and that Florida is contractually bound to indemnify Granco and its subrogee Binnings for the resulting loss.

The Carriage of Goods by Sea Act, 46 U.S.C. § 1303(5) states as follows:

Guaranty of statements.

The shipper shall be deemed to have guaranteed to the carrier the accuracy at

---

**22.** The discovery phase of this case was one of the most difficult in all my years as a judge. When I considered the motion of Florida to dismiss for failure to make discovery, there was ample reason to question good faith on the part of Granco, and its agreement to be dismissed from the case because the discovery was such a burden to it was in effect an admission of its poor attitude toward compliance with discovery. The motion to dismiss was not granted because it is such a severe sanction. The plaintiffs were given a further opportunity to supply all documentation that would have been in Granco's possession. The discovery phase ended with the withdrawal of Florida's counsel in December 1983.

the time of shipment of the marks, number, quantity, and weight, as furnished by him; and the shipper shall indemnify the carrier against all loss, damages, and expenses arising or resulting from inaccuracies in such particulars. The right of the carrier to such indemnity shall in no way limit his responsibility and liability under the contract of carriage to any person other than the shipper.

The relevant portions of the Bill of Lading applicable to the guarantee of the shipper are as follows:

10. The shipper, whether principal or agent:

(a) Represents and warrants that the goods are properly marked ...;

(b) Guarantees the correctness of the particulars and description of the goods ..., and the shipper agrees to be liable for, fully indemnify the carrier and hold it harmless in respect of any ... legal expense, or any other loss, damage, detriment, charge or expense whatsoever arising or resulting in whole or in part from the shipper's failure to do so or to comply with its agreements, guarantees and undertakings as aforesaid....

The particulars and description of the goods or packages appearing in this bill of lading are furnished by the shipper and are not conclusive on and do not constitute admission of or representations by the carrier of the correctness of marks, numbers, quantity, measurement, weight, gauge, contents, nature, condition, condition of containers, quality, value or declared value stated herein.

.    .    .    .    .

The first difficulty with the plaintiff's contention is that it is not clear from the evidence that Florida was the source of the erroneous measurements. Florida's employee Estrada did not provide Alonso with any measurements until Alonso's employee Mary Mire advised him that she needed measurements for her documentation of the shipment. Luis Varela testified, as mentioned previously, that Estrada was not sent to Amite to measure the plants, but only to make packing lists of the parts, and he had no equipment for measuring them. The fact that Estrada forwarded his packing lists to Alonso without measurements corroborates Varela's testimony that measuring was not one of his duties. It is unlikely that he measured the parts after Mary Mire advised him that she needed the measurements because by that time many of the twenty-five truck deliveries of the plants had been made to the First Street Wharf.

If Estrada did not measure the plants, the unanswered question is where did he get the specific measurements for each piece on his packing lists which he provided to Mary Mire by telephone? Varela testified that Granco was to measure the plants and that he requested Granco to send someone to Amite to deliver containers for the small parts of the plants and to obtain information as to the cost of the freight. The evidence discloses that a container was delivered to Amite. Granco produced no witness to testify that it sent no one to Amite to measure the asphalt plants after Varela's request that this be done. Admiral Vasquez testified in his deposition that he had no conversation with Varela about the cost of the freight and referred Varela to Granco's representative in New Orleans, Ignacio Restrepo, for discussion about the shipment. Varela testified at the trial that Vasquez apologized to him in a social gathering some time after Vasquez's deposition for his untrue deposition testimony. Neither Vasquez nor Restrepo appeared to testify at the trial. It can fairly be inferred, however, that information as to the cost of the freight was given to Forero before the end of March, and that he was satisfied with the information when he concluded the purchase of the plants from Florida.

The second difficulty with the contention that Granco's failure to collect the additional freight due was caused by Florida's erroneous measurement of the cargo is that it is not clear from the evidence the reason that Forero, as representative of SICO and PVIP, refused to pay the additional freight demanded by Granco. Granco was not bound in its collection efforts from the consignees by any erroneous measure-

ments stated in the Bills of Lading. Under the terms of the Bills of Lading Granco had the right to correct the freight shown to be due. Since neither Lopez, Granco's employee in the collection department in Bogota, nor Forero testified, the reason for Forero's resistance to the persuasion of Lopez and of Granco's legal department for payment of the additional freight does not appear from the evidence.

Under these circumstances the plaintiffs have not proved by a preponderance of the evidence their claim for indemnification.

The Clerk shall prepare judgment in accordance with the views herein expressed, dismissing the claims of Granco and Binnings against Florida and Alonso, dismissing the cross-claims of Florida and Alonso against each other, and dismissing the counterclaim of Alonso against Binnings.