**BALTIMORE AND OHIO CHICAGO TERMINAL RAILROAD COMPANY, Plaintiff,**

v.

**SOO LINE RAILROAD COMPANY, Environmental Services, Inc., Fritz Enterprises, Inc., Bell Lumber & Pole Company, Neil F. Hartigan, Attorney General of the State of Illinois; Richard Carlson, Director of Environmental Protection Agency, and Illinois Environmental Protection Agency, Defendants.**

No. 84 C 5342.

United States District Court,
N.D. Illinois, E.D.

Sept. 5, 1986.

James R. Gannon, Paul V. Esposito, Douglas A. Lindsay, Thomas E. Brabec, Lewis, Overbeck & Furman, Chicago, Ill., for plaintiff.

Marvin F. Metge, Brian J. Mulhern, Bruce C. Spitzer, Gorham, Metge, Bowman & Hourigan, Chicago, Ill., for defendant Soo Line R. Co.

Andrew D. Thomas, Gregory Prosen, Thomas & Prosen, Homewood, Ill., for defendant Fritz Enterprises, Inc.

Sheldon A. Zabel, Ann Rae Heitland, Schiff, Hardin & Waite, Chicago, Ill., Hugh V. Plunkett, David L. Hashmall, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, Minn., for defendant Bell Lumber & Pole Co.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This case involves an errant interstate rail shipment of waste material in twenty-one open-topped gondola cars. The plaintiff, the Baltimore and Ohio Chicago Terminal Railroad Company ("B & OCT"), has filed a multicount complaint to recover its expenses in handling eighteen of the cars while they were on its Chicago terminal property. B & OCT's expenses included building covers for the cars to prevent rain from washing out the contents, and securing the railcars to protect the public. B & OCT also seeks demurrage charges from some defendants pursuant to a tariff it has filed with the Interstate Commerce Commission. The defendants are Soo Line Railroad Company ("Soo Line"), Environmental Services, Inc. ("ESI"), Fritz Enterprises, Inc. ("Fritz") and Bell Lumber and Pole Company ("Bell").[1]

The rail shipment of the waste material originated on Bell's site in New Brighton, Minnesota. Pursuant to an agreement between Bell and ESI, Bell loaded twenty-one Soo Line gondola cars with waste material consisting primarily of sand and wood chips. The waste material was allegedly contaminated with pentachlorophenol and oil. Bell does not dispute that it was the owner of the waste material prior to loading.

The railcars traveled under bills of lading. Soo Line, as the line haul carrier, transported the railcars from Bell's premises to B & OCT's railyard in Illinois. The bills of lading indicate, and all parties agree, that Fritz Enterprises, Inc., in Riverdale, Illinois, was the intended recipient of the railcars. The bills of lading also identify ESI as the shipper, Soo Line as the line haul carrier, and B & OCT as the delivering carrier. Soo Line had no direct connection

---

1. Three other defendants—Illinois Attorney General Neil Hartigan, Illinois EPA Director Richard Carlson and the Illinois Environmental Protection Agency were voluntarily dismissed without prejudice on November 1, 1984.

to Fritz' property and delivered the cars into B & OCT's hands so that B & OCT could "switch" the cars onto Fritz' property. In rail carrier parlance, B & OCT was the "switching carrier," and Soo Line was the "originating carrier." In all, B & OCT received eighteen cars out of the twenty-one car shipment at its terminal railyard. When B & OCT attempted to deliver the eighteen cars to Fritz, Fritz rejected the shipment and physically blocked the tracks leading to its property. B & OCT refused to accept the remaining three cars from Soo Line.

In early April, 1984, the Illinois Attorney General brought suit against Fritz Enterprises, Inc., Environmental Services, Inc., and their principals in the Chancery Division of the Circuit Court of Cook County, Illinois. *People of the State of Illinois v. Fritz Enterprises, Inc., et al.,* 84 CH 3081. The Attorney General sought a Temporary Restraining Order ("TRO") to prohibit the defendants from taking any actions to unload or treat the waste material. The TRO was entered by Circuit Court Judge Albert Green on April 6, 1984. In July, 1984, the TRO was modified to permit the return of the railcars to Minnesota. The Attorney General requested the modification after entering into a settlement agreement with Bell, ESI and Fritz.

The eighteen railcars containing the waste material remained on B & OCT's premises until July 20, 1984. On or about that date, B & OCT returned the cars to Soo Line. Soo Line, in turn, transported the cars and their contents back to the Bell site in New Brighton where presumably they were unloaded.

The expenses B & OCT claims as damages in this case were incurred while the eighteen cars were in the B & OCT terminal railyard. In its complaint, B & OCT requested the Court to order the defendants to remove the cars from its premises. When the cars were returned to Minnesota, that portion of the dispute became moot.

Defendants Soo Line and Fritz have moved to dismiss the complaint for failure to state a claim. Bell has moved to dismiss this action for lack of personal jurisdiction, or alternatively, to transfer this case to the District of Minnesota. Fritz has moved to strike ESI's cross-claim for failure to comply with Fed.R. of Civ.P. 11. As set out below, all of the motions are denied.

## II. Soo Line's Rule 12(b)(6) Motion to Dimiss Count I

Defendant Soo Line has moved to dismiss Count I pursuant to Fed.R. of Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Both Soo Line and B & OCT have submitted documents and affidavits in recognition of the Court's power to treat Soo Line's motion as one for summary judgment under Rule 56. The Court has concluded that it cannot consider the appropriateness of summary judgment since Soo Line and B & OCT have not fully addressed all the relevant factual and legal issues.[2] Rather, the Court has confined its review to the Rule 12(b)(6) challenge made by Soo Line. The Court holds that B &

---

2. The Court recognizes that counsel for both Soo Line and B & OCT have expended a great deal of effort briefing this motion. If it were possible, the Court would prefer to decide the motion pursuant to Rule 56. The Court concludes, however, that it was premature for Soo Line to move for summary judgment before the complicated legal question concerning the sufficiency of the complaint was resolved. Now that the Court has ruled, the parties can consider other important, but previously unaddressed, legal issues. A non-exhaustive list of these issues includes choice of law concerns, principles of agency law, and the interaction between common law agency principles and specific contractual rights and obligations. Similarly, the factual issues in this case, as highlighted by the parties' briefs, affidavits, and exhibits, can now be placed in the correct legal context so that the Court can properly consider them.

The Court notes that the strictures of Rule 56 would have precluded summary judgment for Soo Line in any event. Soo Line's failure to discuss Tariff ICC BOE 6000–C (incorporated by reference as item 15 into Chessie System Railroads Freight Tariff BEF 8001–A) and its applicability to the instant case, is but one of several unresolved factual issues concerning the relationship between Soo Line and B & OCT. Neither B & OCT, nor Soo Line, has sufficiently addressed the various agreements, rules and tariffs to enable the Court to resolve the factual disputes and rule as a matter of law whether they limit B & OCT's rights against Soo Line.

OCT has stated a common law claim for indemnity and Soo Line's motion accordingly is denied.[3]

Soo Line and B & OCT are rail carriers regulated by the provisions of the Interstate Commerce Act, 49 U.S.C. § 10101, *et seq.* ("I.C.A."). As discussed in the Introduction, B & OCT became involved in this dispute because its railyard abuts the property of the shipment consignee—Fritz. Soo Line passed the cars into B & OCT's hands with the expectation that B & OCT could and would deliver them to Fritz. Fritz, however, refused to accept delivery and B & OCT was left with possession of the eighteen cars from approximately March 23, 1984, until the cars were returned to Minnesota in July of 1984.

In Count I of its complaint, B & OCT alleges that when it accepted the railcars from Soo Line, it did so solely as Soo Line's agent and for the limited purpose of delivering the railcars to Fritz. B & OCT claims a common law right to be indemnified for the reasonable expenses it incurred on behalf of its principal—Soo Line.

In addition to its factual arguments, which the Court has explained it will not consider at this time, Soo Line makes one wholly legal argument against Count I. Soo Line argues that a switching carrier cannot sue an originating carrier for an amount not specified in a tariff on file with the Interstate Commerce Commission. Soo Line bases its argument on a provision in the Interstate Commerce Act which provides in relevant part:

> ... [a] carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person ... or another device.

49 U.S.C. § 10761. Because Chessie System Railroads Freight Tariff BEF 8001–A (the Reciprocal Switching Tariff) specifies a $261 per railcar charge for B & OCT switching services, Soo Line argues B &

OCT is limited to that amount in payment for *all* services B & OCT rendered. In essence, Soo Line argues that Congress preempted all rail carriers' common law rights against fellow carriers with respect to payment for services rendered during the interstate transportation of freight. Soo Line proposes an absolute rule that makes no allowances for unusual situations created by the nature of the property passed on to the switching carrier by the line haul carrier.

Neither Soo Line nor B & OCT has provided the Court with any authority to support their respective positions on this question. The Court's own research has similarly failed to locate a definitive case. As explained below, the cases cited by Soo Line are all distinguishable.

The five Supreme Court cases relied upon by Soo Line are *New York Central & Hudson River Railroad Company v. York & Whitney Co.*, 256 U.S. 406, 41 S.Ct. 509, 65 L.Ed. 1016 (1921) ("York"); *Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink*, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919) ("Fink"); *Georgia, Florida & Alabama Railway Co. v. Blish Milling Co.*, 241 U.S. 190, 39 S.Ct. 541, 60 L.Ed. 948 (1916) ("Blish"); *Cleveland, Cincinnati, Chicago & St. Louis Railway Co. v. Dettlebach*, 239 U.S. 588, 36 S.Ct. 177, 60 L.Ed. 453 (1916) ("Dettlebach"); and *Southern Railway Co. v. Prescott*, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836 (1910) ("Prescott").

*Dettlebach, Prescott* and *Blish* were all actions by shippers or consignees against carriers for damages to freight. The Supreme Court consistently held that carriers were entitled to the protection of provisions in the bills of lading limiting the carriers' liability. The carriers were protected by bill of lading provisions even if they were serving as warehousemen at the time of the loss. The rationale behind all of these cases is that the relationship between a carrier and a shipper or consignee is solely

---

3. In considering a motion to dismiss the Court accepts as true all well-pled facts and views all allegations in the complaint in the light most

favorable to the plaintiff. *Wilson v. Harris Trust & Savings Bank*, 777 F.2d 1246, 1247 (7th Cir.1985).

defined by the I.C.A. and the travel documents. The Supreme Court mandated strict adherence to uniform standards to further Congress' goal of preventing discrimination by carriers in favor of certain customers. *See, Southern Pacific Transportation Co. v. Commercial Metals Co.,* 456 U.S. 336, 344, 102 S.Ct. 1815, 72 L.Ed.2d 114 (1982). Because all three cases examine only the relationship between carriers and non-carriers, they are not valid authority on the issue presented by this case.

Similarly, *Fink* and *York* have little weight because both cases involve suits by railroads to collect full tariff rates from customers. The Supreme Court's holding was limited to the rule that private agreements between railroads and customers will not excuse a railroad from collecting the proper tariff amount. Again, these rulings clearly further Congress' desire to force the railroads to implement uniform rates. Neither case addresses the carrier against carrier situation present in this case.

As noted, all of the cases cited by Soo Line involve disputes between carriers and non-carriers. It is true that courts have required strict adherence to tariff rates in such cases. The uniformity of the decisions is not surprising given the purpose behind the enactment of the I.C.A. Congress' intent was to prohibit carriers from discriminating between shippers on either price or service. Under the Act, all shippers must pay the same tariff rate and receive the same service. Carriers are required to collect the full tariff amount even if an innocent mistake was made, *St. Louis Southwestern Ry. Co. v. Garvey Elevators, Inc.,* 505 F.2d 625, 626 (5th Cir.1974), and shippers are required to pay the full tariff amount even if the carrier intentionally misrepresented the rate. *Aero Trucking, Inc. v. Regal Tube Co.,* 594 F.2d 619 (7th Cir.1979). However, the abuse Congress addressed is not present in the instant situation which involves an intercarrier dispute over extraordinary items of expense.

The fact that B & OCT may have rights under the bills of lading against the shipper, owner and/or consignee does not affect its rights vis-a-vis Soo Line. Similarly, the fact that with the enactment of 49 U.S.C. § 11707 Congress preempted common law actions against carriers for damages to property *(See, Wirth, Ltd. v. Silvretta,* 575 F.Supp. 1274 (N.D.Ill.1984)), does not suggest Congress has done so in the instant case. Rather, Congress specifically preserved most common law remedies:

> Except as otherwise provided in this subtitle, the remedies provided under this subtitle are in addition to remedies existing under another law or at common law.

49 U.S.C. § 10103.

■ Since no provision of the Interstate Commerce Act or Bill of Lading Act, 49 U.S.C. § 81, *et seq.,* specifically forecloses B & OCT's common law rights against Soo Line, the Court holds that B & OCT has stated a common law indemnity action against Soo Line based upon B & OCT's alleged agency. In deciding this motion to dismiss, the Court has not: (1) considered whether a principal-agent relationship between Soo Line and B & OCT in fact exists; (2) considered the respective rights and obligations of B & OCT and Soo Line pursuant to the alleged agency; (3) considered how the various tariffs and other agreements might limit Soo Line's obligations; or (4) considered what substantive law governs the remaining issues.

### III. Fritz' Rule 12(b)(6) Motion to Dismiss

Defendant Fritz has moved to dismiss the complaint pursuant to Fed.R. of Civ.P. 12(b)(6). In its amended motion to dismiss, Fritz requested that the Court treat its motion as being one for summary judgment. Pursuant to the authority conferred by Rule 12(b), the Court will apply Rule 56 standards to Fritz' motion. For the reasons stated below, Fritz' motion for summary judgment is denied.

Summary judgment "is appropriate when 'there is no genuine issue as to any materi-

al fact and ... the moving party is entitled to a judgment as a matter of law.'" *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985) (quoting Rule 50(c)). The Seventh Circuit has recently detailed the standards which the trial court is to apply to a motion for summary judgment:

> 'The party moving for summary judgment has the burden of establishing the lack of a genuine issue of material fact.' [citation omitted] Thus, 'in determining whether factual issues exist, a reviewing court must view all of the evidence in the light most favorable to the non-moving party.' [citations omitted] 'Where the moving party fails to meet its strict burden of proof, summary judgment cannot be entered ...' [citation omitted] ... '[T]he responsibility of the district judge on a motion for summary judgment is merely to determine whether there are issues to be tried, rather than to try the issues himself via affidavits.' [citations omitted]

*McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1167 (7th Cir. 1986). Applying these standards to Fritz' motion, it is clear that Fritz has failed to meet its burden.

■ Fritz proposes two defenses to B & OCT's claim. First, Fritz argues that the liability of a consignee to a carrier for freight or other charges is contingent on the consignee accepting the goods. It argues that it has no liability to B & OCT because the waste material did not conform to the Fritz-ESI treatment contract, and therefore, Fritz' rejection was justified.

Essential to Fritz' argument would be a determination by this Court that the material was indeed non-conforming. In support of its position, Fritz has offered the affidavit of its President, Charles R. Fritz. In his affidavit Mr. Fritz states, "[t]hat FRITZ ENTERPRISES, INC., properly rejected the materials delivered treating it(sic) as non-conforming goods." (Fritz Aff. at ¶ 6). Whether or not the material conformed to the Fritz-ESI contract is an ultimate question of fact. Mr. Fritz' opinion on the issue is not evidence, and certainly does not satisfy Fritz' burden under Rule 56.

Fritz also points to the TRO entered by Judge Green to support its argument. The Fritz-ESI contract provides in part that "Environmental Services, Inc. guarantees that this material is non-hazardous and is subject to the specifications listed on the attached sheets." One paragraph in the *ex parte* order states, "[t]hat the excavated waste is contaminated with polychlorophenols (PCP's) which are hazardous wastes." (April 5, 1984 TRO at ¶ B(2)). Fritz argues that the TRO finding conclusively establishes that the material did not conform to the Fritz-ESI contract. It should be obvious that a factual finding in an *ex parte* TRO is not binding on the defendants to *that* action, let alone on a non-party such as B & OCT.

Based on the evidence submitted by Fritz, the Court cannot rule as a matter of law that the material did not conform to the Fritz-ESI contract. Because such a ruling is the *sine qua non* of Fritz' argument, its motion for summary judgment on this ground must fail.

■ The second defense forming a basis for Fritz' motion is the doctrine of *vis major*. Fritz argues that governmental action made it impossible for it to live up to its contractual obligations. As support for its argument, Fritz again points to the TRO entered by Judge Green. Fritz claims it was prevented by the TRO from accepting the material onto its property. Fritz cannot, however, explain away the fact that Fritz' rejection came approximately two weeks *before* the TRO was entered. Fritz has presented no *evidence* as to what governmental activity precluded it from accepting the material during those two weeks. Because a question remains as to exactly why Fritz's refused to accept the material when it was tendered by B & OCT, Fritz' motion for summary judgment based upon the *vis major* doctrine must also fail.

The factual deficiencies in Fritz' proof present a sufficient reason for the Court to deny Fritz' motion. The Court notes, however, that Fritz' memorandum of law and

supplemental memorandum of law are wholly inadequate to support its legal positions. Fritz has failed even to discuss the relationship between the conditions in the bills of lading and the defenses it pleads. Since neither Fritz, nor B & OCT, properly addressed the applicability of these defenses in a case of this kind, the Court cannot at this time reach a decision on the defenses' potential merit.

### IV. Bell's Rule 12(b)(2) Motion to Dismiss and Motion to Transfer

Defendant Bell has moved to dismiss the complaint pursuant to Fed.R. of Civ.P. 12(b)(2). As discussed below, Bell has alternatively moved to transfer this case to the United States District Court for the District of Minnesota.

### A. Motion to Dismiss

Bell contends that it is not subject to personal jurisdiction within Illinois and that therefore this Court has no personal jurisdiction over Bell. The Court has wide procedural latitude in resolving a Rule 12(b)(2) motion since the rule does not specify the procedure to be followed. *O'Hare International Bank v. Hampton*, 437 F.2d 1173, 1176 (7th Cir.1971). However, the "rule clearly contemplates hearing and determination of jurisdictional issues in advance of trial." *Id.* The parties have submitted affidavits, documentary evidence and deposition transcripts in support of their respective positions. The Court can properly consider all of these materials. *Nelson By Carson v. Park Industries, Inc.*, 717 F.2d 1120, 1123 (7th Cir.1983).

The Seventh Circuit has set out the standards that govern this Court's decision:

> During this preliminary proceeding, although the burden of proof rests on the party asserting jurisdiction, if the district court's decision is based on the submission of written materials the burden of proof is met by a prima facie showing that personal jurisdiction is conferred under the relevant jurisdictional statute. [citations omitted] Further, the party asserting jurisdiction is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.

*Id.* The Court holds that B & OCT has made a prima facie showing that Bell is subject to personal jurisdiction in this matter. Therefore, Bell's motion to dismiss is denied.

This Court's power over a non-resident defendant parallels that of an Illinois state court. *Davis v. A & J Electronics*, 792 F.2d 74, 75–76 (7th Cir.1986). The Illinois long arm statute, Ill.Rev.Stat. ch. 110, ¶ 2–209, defines the factual circumstances under which an Illinois court, and hence this Court, may assert jurisdiction over non-residents. Illinois has not necessarily exercised its full power to subject non-resident defendants to Illinois jurisdiction. *Snyder v. Smith*, 736 F.2d 409, 416 (7th Cir.1984). The proper analysis of Bell's jurisdictional challenge is thus twofold: first, does the defendant's conduct fall within the provisions of the Illinois long arm statute; and second, does subjecting Bell to jurisdiction in Illinois violate Bell's rights under the Due Process Clause of the Fourteenth Amendment?

The Illinois long arm act provides in relevant part:

> ... Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any such acts:
>
> (1) The transaction of any business within this State; ...

Ill.Rev.Stat. ch. 110, § 2–209. "The 'transaction of business' standard does not require that the nonresident defendant conduct business within Illinois regularly or systematically; a single act may be sufficient, as long as the cause of action arises from that act." *Snyder*, 736 F.2d at 416 (citing *Johnston v. United Presbyterian Church*, 103 Ill.App.3d 869, 59 Ill.Dec. 518, 431 N.E.2d 1275 (1st Dist.1981). Defendants have been subjected to Illinois jurisdic-

tion under the long arm statute where they shipped goods into Illinois. *Nortown Steel Sup. Co. v. Northern Indiana Steel Sup. Co.,* 340 F.2d 934, 935 (7th Cir.1965); *Ronco, Inc. v. Plastics, Inc.,* 539 F.Supp. 391, 397 (N.D.Ill.1982); *Tabor & Co. v. McNall,* 30 Ill.App.3d 593, 333 N.E.2d 562, 563 (4th Dist.1975). Because the instant case clearly arises out of the shipment of the waste into Illinois, the only remaining inquiry is into the nature of Bell's interest in the waste when it entered Illinois.

■ Bell strenuously contends that pursuant to the agreement with ESI, it had no right, title or interest in the waste material after it was loaded onto the Soo Line gondola cars in New Brighton, Minnesota. It argues that ESI was free to dispose of the material in any lawful manner. Bell's position is refuted by the text of the very written agreements upon which it relies. Recital number two in the agreement between ESI and Bell provides:

> Upon the loadings of the materials into the railcars and upon their removal from the premises of Bell, Environment shall take title in, and assume full and complete liability for the materials. *Said title shall be evidenced by a bill of sale, a copy of which is attached hereto and made a part hereof.*

(emphasis added). The text of the bills of sale incorporated into the Bell-ESI agreement contain the following language:

> We hereby sell, assign, transfer and set over to Environmental Services, Inc. all of our right, title and interest and transfer possession for the disposition of the above materials, *subject to facility acceptance,* ...

(emphasis added).

The facility referred to, Fritz, never accepted the material. The recital, although somewhat different from the bills of sale, does provide that the *bill of sale* will be the evidence of title. Fritz' rejection, the apparent supremacy of the bills of sale, and the fact that the material was returned to

Bell's possession, taken together, indicate that title remained with Bell during the entire period the material was in Illinois. By shipping its material into Illinois, Bell transacted business in Illinois within the meaning of the long arm statute.

■ Regardless of the title issue, other provisions of the Bell-ESI agreement demonstrate that Bell maintained a sufficient interest in the waste material such that it can be said to have transacted business in Illinois.

Recital number eight in the Bell-ESI agreement obligates ESI to "provide Bell with a complete written description of the processes and facilities to be utilized in the treatment, disposal and/or recycling of the materials...." It goes on to set out how Bell can "accept" the proposed plan. Contrary to Bell's assertion, it is clear that Bell was greatly concerned with how the waste would be disposed. Moreover, Bell specifically approved Fritz as the treatment facility and Fritz' treatment procedure. The agreement terms did not permit ESI to ship the material to Illinois. Rather, they obligated ESI to ship the material to Illinois so that Fritz could process it in accordance with ESI's proposal to Bell.

Additionally, recital number five provides that Bell's final payment to ESI was conditioned on Bell's receipt "of a letter of completion from the facility, certifying that all material has been treated, disposed of and/or recycled." It is obvious that Bell's concern over the disposition of the material extended beyond the time the railcars crossed Bell's property line.

Even if "legal title" passed to ESI when the material was removed from Bell's property, the other provisions of the agreement demonstrate that Bell maintained rights and interests in the waste material when it entered Illinois. By approving Illinois as the depository for the material in which Bell had these interests, Bell "transacted business" in Illinois.[4]

---

**4.** The Court's conclusion makes it unnecessary to consider Bell's additional connections with Illinois.

A state's exercise of jurisdiction over non-resident defendants is constrained by the Due Process Clause of the Fourteenth Amendment. *Kulko v. California Superior Court*, 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978). "Due process requires that the defendant be given adequate notice of the suit, *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 313–314, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950), and be subject to the personal jurisdiction of the court, *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). As in *World-Wide*, there is no notice question in the instant case. The only question is whether there are "minimum contacts" between Bell and Illinois. *International Shoe v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Also, "it is essential ... that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).

■ The evidence submitted to the Court establishes that Bell was fully aware that the material was destined for treatment and disposal in Illinois. And, as noted above, the Bell-ESI agreement demonstrates that Bell continued to have rights, interests and possibly title in the waste material during the time the railcars were in Illinois. There is also no question that by entering into a contract that provided for the treatment of potentially hazardous waste in Illinois, Bell invoked the benefits and protections of Illinois environmental laws and regulations. Given these facts, the Court finds that Bell had the requisite minimum contacts with Illinois for the purposes of this lawsuit.

Bell's attempt to hide behind its agreement with ESI fails because the terms of that agreement evidence the continuing interests of Bell in the waste material. None of the cases cited by Bell support its position. Broadly stated, those cases stand for two propositions: first, that the unilateral acts of the plaintiff or another party cannot subject a defendant to jurisdiction; and second, that a defendant that truly no longer has interests in a product cannot be hailed into court merely because the product appears in the forum. It was Bell's own acts that are dispositive of the jurisdictional question in this case. And, as discussed, Bell did not simply abandon all of its rights and interests in the waste material when Bell arranged for the removal from its Minnesota property.

Finally, Bell's counsel suggests that the Court's decision with regard to jurisdiction should be influenced by the merits of B & OCT's claim. That suggestion is, of course, improper as it essentially asks the Court to disregard the law. Thus, the Court rejects it.

### B. Motion To Transfer[5]

■ As an alternative to its Rule 12(b)(2) motion, Bell has requested the Court to transfer this action to Minnesota pursuant to 28 U.S.C. § 1404(a). For the reasons given below, the motion is denied.

Under Section 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Although these factors are exclusive, they "are best viewed as placeholders for a broader set of considerations, the contours of which turn upon the particular facts of each case." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219 n. 3. (7th Cir.1986). The movant has the burden of establishing "that the transferee forum is clearly more convenient." *Id.* at 5. Bell has failed to meet its burden under § 1404(a).

---

**5.** The Court has decided to consider Bell's motion to transfer even though Bell first set forth the grounds for the motion in its Reply brief. B

& OCT was not prejudiced because it was able to anticipate Bell's arguments.

Bell makes much of the fact that a suit between it and ESI was pending before the United States District Court for the District of Minnesota. The two cases are, however, no longer active. ESI's suit was dismissed for want of prosecution and Bell was granted a default judgment against ESI on its claim. Because the Minnesota cases are closed, judicial efficiency would not be served by transferring this case to Minnesota.

Also, the Court believes that the rights and obligations of the respective parties will largely turn on the interpretation of written contracts. It is thus likely that few Minnesota residents will have to testify in Illinois. As to damages questions, however, the Court expects many Illinois residents will be subpoenaed to testify. Therefore, the convenience of witnesses factor weighs against Bell. Likewise, Bell has presented no convincing evidence that it will be greatly inconvenienced by defending this suit in Illinois. In any event, the inconvenience faced by the three Illinois based parties should this case be transferred to Minnesota would outweigh the inconvenience now experienced by Bell. Furthermore, the interpretation of the bills of lading provisions is not a matter of Minnesota law, rather, it is a question of federal law.

Although it may be true, as Bell claims, that the Bell-ESI dispute was centered in Minnesota, the dispute between B & OCT and the defendants in this case is clearly centered in Illinois.

### V. Fritz' Motion to Strike ESI's Cross Claim

■ As part of its answer, ESI filed a breach of contract cross-claim against Fritz. Fritz has filed a two sentence motion to dismiss ESI's cross-claim. Fritz states that the cross-claim violates Fed.R. of Civ.P. 11. In support of its motion Fritz has attached an incomplete copy of the Fritz-ESI agreement along with a copy of the Temporary Restraining Order entered by Judge Green on April 6, 1984.

Local Rule 13(a) requires moving parties to support their motions with memoranda of law containing citations to authority. On November 15, 1984, Fritz was ordered to file a brief in support of its motion. Fritz has not done so. The Court will not ferret out Fritz' arguments for it. Accordingly, Fritz' motion to strike ESI's cross-claim is itself stricken pursuant to Local Rule 13(b).

### CONCLUSION

Soo Line, Fritz, and Bell's motions to dismiss the complaint are denied. Bell's alternative motion to transfer is denied. Fritz' motion to strike ESI's crossclaim is itself stricken. Soo Line and Bell are granted 21 days to answer the complaint. All parties are ordered to appear for a status hearing on September 23, 1986, at 9:30 a.m.